## James Thomas & al. vs. Moses Patten & als.

Where the number of the lot on a plan referred to in the deed is the only description of the land conveyed; the courses, distances and other particulars in that plan are to have the same effect, as if recited in the deed.

It is a well settled rule, that where an actual survey was made, and monuments were marked or erected, and *a plan was afterwards made,* intended to delineate such survey; and there proves to be a variance between the survey and the plan, that the survey must govern.

But no such rule of construction has obtained, where the survey was subsequent to the plan.

Where a survey and plan were made in 1801; and the same surveyor went upon the land in 1802, made another survey and put down stakes as monuments, not intending to conform to the plan, and designedly varying from it, but made no new plan, or alteration in the former one; and a conveyance was made in 1803, in which the only description in the deed was a certain lot on that plan; *it was held,* that the extent of the grant was to be ascertained by the plan, and not by the monuments thus erected.

This was a writ of *entry,* brought to recover a certain piece of land, described in the declaration, in the city of *Bangor,* in which the demandants counted upon their own seisin, and upon a disseisin by the tenants. The general issue was pleaded and joined. It was admitted that *James Dunning* the elder, was an original settler in *Bangor,* and was possessed as such of the land in controversy, and of contiguous land. That he died prior to *January,* 1790, intestate, leaving as heirs, *James Dunning,* his oldest son, and six other children. *James,* the son, was entitled by descent to two shares, and by deed, dated *October* 14, 1793, he purchased three other shares or eighths of *Robert, William & Anne,* his brothers and sister. Being thus the owner of five eighths, *James Dunning,* the son, did by deed of warranty, dated

*October* 1, 1798, duly acknowledged and recorded *October* 8, 1798, convey to *Thomas Rice*, one acre of the common land described, in severalty, by metes and bounds. *Thomas Rice*, by deed of warranty, dated the 11th, acknowledged the 12th of *November*, and recorded *December*, 30th, 1801, conveyed the same acre by metes and bounds and in severalty to *Jonathan Hyde;* and that land was afterwards known by the name of the *Hyde* acre. The demandants adduced in evidence, a deed dated *June* 1, acknowledged *December* 3, and recorded *December* 29, 1800, from *James Dunning* and wife to the demandants, conveying to them his five eighths of all the land described, reserving and excepting out of said five eighths, the *Hyde* acre and two other pieces previously conveyed by him by metes and bounds. It appeared that *Andrew Dunning*, one of the children and heirs of *James*, the father, did by deed dated 5th of *August*, acknowledged *August* 16, and recorded *August* 25, 1800, convey his share or eighth, to the tenants. With a view to a partition of the common lands among the several tenants, they caused *Moses Hodsdon* to make a survey and plan of their lands in 1801. Thereafterwards there was assigned and conveyed to the tenants, by deed dated *April* 3, 1803, by their co-tenants, lot number 39 and other lots, and to the demandants, by deed dated *April* 2, 1803, there was assigned and conveyed by the other co-tenants, lot number 73 and other lots, and the deeds of release executed and received by the several co-tenants described the lots by number, according to a plan made by *Moses Hodsdon, May* 14, 1801. That plan was produced by the demandants at the trial. *Moses Hodsdon*, the surveyor, being called as a witness by the tenants, testified that he made and delivered the plan to *Dudley*, one of the demandants, in 1801. That at that time the south line of the lot marked as 73 on that plan, was not then drawn by him, nor were these figures made by him on that plan, that he did not again see the plan until *October*, 1834, when it had upon it delineated the figures 73, and the south line of that lot, but how or by whom made, he did not know; that the lot marked 73, was intended to delineate the *Hyde* acre, but was left incomplete by reason of a mistake discovered in regard to what was supposed to be the south line of that acre, and that the other lots he did at

the time plat and lay down. By a survey and plan made by *Jedediah Herrick*, by order of Court, verified by his testimony, it appeared that there was between the lots thus platted and the true south line of the *Hyde* acre, a gore of land, and that part of the gore, which lay between lot No. 39, as laid down on that plan, and the *Hyde* acre was demanded in this action. *Moses Hodsdon*, further testified that the existence of this gore was discovered in 1802, whereupon a majority of the co-tenants, and he had no doubt that among them both the demandants, called upon him to make a new survey, and to average the gore among the lots between the *Hyde* acre and water street. This he stated he proceeded to do, and put down stakes at the corners of the lots thus enlarged; and that so far as he knew, the owners occupied according to the new survey. There was testimony tending to shew, that *Dudley* owned and occupied lot No. 40, south of 39, and also lot No. 34 and half of No. 35, being part of the five lots in the rear, according to the new survey. It appeared that the tenants claimed to extend lot No. 39, up to the *Hyde* acre, and that they had occupied the land now demanded, or a portion of it, by piling thereon lumber from time to time; a considerable proportion however of the land demanded lay below high water mark. The trial was before *Weston C. J.*, who instructed the jury, that if the demandants were not entitled to recover the gore demanded, as a part of lot No. 73, they were entitled to recover five-eighths of it, as common and undivided; and that the division made by *Hodsdon* in 1802, and what followed by the parol direction of the co-tenants, did not create a several tenancy in that gore, unless where the tenants had held accordingly by an exclusive, notorious, and continued possession, for a period of more than twenty years, prior to the commencement of the action. The jury returned a general verdict for the tenants. If *they were properly instructed*, the verdict was to be set aside, and a new trial granted.

The case was argued by *Mellen* and *Rogers* for the demandants, and by *F. Allen* and *J. Appleton* for the tenants.

For the demandants it was said, that the only question before the Court was, whether the instructions of the Judge were, or were not correct.

Five eighths of the land in controversy were conveyed to the demandants, and three eighths to the tenants. It is here unnecessary to inquire, whether we are entitled to the whole, or to the five eighths, as in either case we are to have a new trial. The division deeds only conveyed such lots as were then marked and numbered on the plan made in 1801. The land now demanded was not then thus marked or numbered on the plan, and of course not conveyed by the deeds. As the deeds refer to the plan by numbers, the lines and distances marked on the plan have the same effect, as if they had been inserted in the deeds. If there was a parol partition made afterwards, that was void, and there is no evidence in the report of any title in the defendants acquired by disseising the owners. There was only a little lumber occasionally placed on a small part of the land ; and as to most of it, it is not even pretended, that there was occupation of any kind. The putting down of the stakes was not done to locate the land according to the plan or deeds, but for a purpose wholly different. The cases on that subject therefore have no application here. They cited *Porter* v. *Perkins*, 5 *Mass. R.* 233; *Whitney* v. *Holmes*, 15 *Mass. R.* 152.

For the tenants it was insisted, that the plan made by *Hodsdon*, and as made by him, was to govern. The report only shews, that the plan went into the hands of *Thomas*, but does not show by whom the alterations were made; especially, it does not shew, that the tenants assented. The location of the land was afterwards made and monuments erected with the intent to conform to the plan, and to complete any deficiencies therein. The actual survey and location upon the earth, and the erection of monuments according to the survey control the plan, although it is referred to in the deed. This was done before the division and partition by deed, and must be decisive of their rights. But if the deeds had been made first and the survey and location made afterwards, the same result must have followed. There was no gore of land at that time, but the whole of the land held in common was conveyed to be held by them respectively in severalty. The instruction, therefore, that the demandants were entitled to recover five eighths of the tract, as common and undivided, was erroneous, as in the division no part of the demanded premises

fell to their share. It was also wrong because the tenants would have acquired a title to it, if they had not obtained it otherwise, by the parol division made in 1802, and the possession under it since. It was occupied, as part of the lot on which the buildings stood, and actually used, as much as land of that description can be. After a lapse of twenty years, and occupation during the time, a deed is to be presumed. The demandants cannot prevail, because they stood by and saw the tenants making improvements, without asserting their right, for more than twenty years. The verdict ought not to be set aside, because the Court cannot avoid seeing, that in this case substantial justice has been done. They cited, 12 *Mass. R.* 469 ; 17 *Mass. R.* 207 ; 13 *Pick.* 267 ; 5 *Greenl.* 24 ; 7 *Greenl.* 61 ; 2 *N. H. Rep.* 197 ; 7 *Johns. R.* 238 ; 6 *Wend.* 467 ; 7 *Cowen,* 761 ; 1 *Caines,* 362 ; *Mathews on Presumptions,* 196 ; 3 *Greenl.* 316 ; *Cowper,* 217 ; 13 *Pick.* 251 ; 1 *Phillip's Ev.* 121 ; 3 *Paige's C. R.* 545 ; 1 *Johns. C. R.* 354 ; 4 *Wheaton,* 513 ; 1 *Greenl.* 219 ; 2 *Greenl.* 213.

The action was continued for advisement, and the opinion of the Court afterwards drawn up by

WESTON C. J. — The tenants are the owners of lot number thirty-nine, according to a plan made by *Moses Hodsdon, May* 14, 1801. There being no other description of that lot, its location must depend altogether upon the plan. And the courses, distances and other particulars in that plan are to have the same effect, as if recited and set forth in the deed. *Davis et al. v. Rainsford,* 17 *Mass.* 207 ; *Ripley v. Berry et al.* 5 *Greenl.* 24. This is a rule of law well settled in our practice, in reference to deeds, containing no other description of the land conveyed, than the number of the lot and the number of the range, according to the plan of a township. The plan referred to in the deed, under which the tenants hold, has been produced ; and there does not appear to be any difficulty in locating the lot, according to the plan. For although the surveyor has testified, that one of the side lines of lot number seventy-three, which on the plan produced, is also one of the side lines of thirty-nine, was not drawn upon the plan, when it went from his hands ; yet the other side line and the two end lines of thirty-nine being delineated, and

the exact distance between the side lines marked on the plan, the true boundaries of that lot may be ascertained with entire precision. The location of the whole range or tier of lots, of which this is one, is found by an exact admeasurement, according to the plan, from water-street, which is a fixed point.

But it is insisted that this location is to be controlled by the monuments put down by the surveyor, subsequent to the plan, and prior to the deed. Had he established monuments at the angles, and had afterwards made a plan, which was intended to be a delineation of his survey, the plan must have yielded to the monuments, if there had been any discrepancy between them. But no such construction has obtained, where the survey was subsequent to the plan. In *Esmond* v. *Tarbox*, 7 *Greenl.* 61, cited in the argument, although the survey was made by one surveyor, and the plan referred to by another, yet the survey preceded the plan, and the monuments held decisive in that case, were set up at the time of the survey. In *Makepeace* v. *Bancroft*, and in *Davis et al.* v. *Rainsford*, monuments were referred to in the deeds, which were afterwards located, and it being justly inferred that they were intended to conform to the deeds, they were regarded as conclusive upon the parties. Here the monuments put up by the surveyor, were neither referred to in the deed, nor marked on the plan.

The surveyor testifies that the error in the plan was discovered in 1802, and thereupon by a new survey, the gore, a part of which is sought to be recovered in this action, was averaged between the lots, and stakes put down accordingly at the new corners thus established. As his plan was made only the year before, and deeds had not then been given, to carry into effect the contemplated partition, it is somewhat remarkable, that a new plan was not made, or that the former one was not corrected, or at least some explanatory certificate entered upon it. And it is still more remarkable, that in the following year, when deeds of release were given, reference was made to a plan, then recently discovered to have been erroneous, without the slightest intimation, that measures had been taken for its correction. This accords so little with the conduct of men of ordinary prudence, as to throw distrust upon the accuracy of the surveyor, as to the time

of the new survey ; and it illustrates the danger of suffering written memorials to be explained or modified by parol testimony, resting in memory ; especially after the lapse of many years. But assuming, as it is proper to do, for the purposes of this inquiry, that the surveyor's testimony is correct, both as to what was done and the time when, the new survey, and the monuments thereupon established, were not intended or designed to conform to the plan referred to in the deed under consideration ; so that this case bears no resemblance to those before cited. And we are very clearly of opinion, that by law, lot number thirty-nine must depend for its location upon the plan of 1801, to which, and to which alone, it refers for a description of the land, upon which it was to operate.

There is great reason to believe, that the proprietors of these lands, when apprized of the existence of the gore, then of trifling value, divided it among themselves, by widening their respective lots, and that the demandants assented to this arrangement, and participated in the division. And if, without violating the principles of law, the partition thus made could be held effectual, it would seem best to accord with the equity of the case. But lands can neither be conveyed, nor divided by parol. The law requires that this should be done by deed. If parties will be so improvident as to pursue a different mode, and their confidence in each other turns out to have been misplaced, we are not at liberty to bend the law to meet the apparent justice of such a case. More injustice would be done than remedied, by thus unsettling the rules of law.

There is no doubt, that one tenant in common may oust his co-tenants, and acquire by lapse of time, and by force of the statute of limitations, an estate in severalty. This effect could not arise from exclusive possession alone, because he would be presumed to hold for himself and his co-tenants. But if long continued, without any claim on their part, and especially if their right had been denied or resisted, it would be evidence of ouster. In *Rickard* v. *Rickard*, 13 *Pick*. 251, several descents had been cast, and the estate in controversy had been settled in the probate office, in a manner inconsistent with the continuance of an estate in common. The other co-tenants, whose interest had not been

Thomas *v.* Patten.

asserted for over seventy years, were there held barred by the statute of limitations. A tenant in common, who ousts his companion, is a wrongdoer, and we are aware of no reason, which presents his claim more favorably, than that of a disseisor. If his possession be continued and exclusive, and under circumstances from which an ouster may be inferred, the right of his cotenant may be lost by lapse of time. The report states, that the tenants had used part of the land from time to time, as a place for the deposit of lumber. This seems to imply, that their occupancy of the land in this manner, was not constant, but remitted. At any rate, as it applied to only part of the land, and was consistent with a tenancy in common, it does not justify the verdict, which excludes the demandants from the whole. On a further trial, the tenants will have it in their power to make as much of this point, as by law they may. Upon the whole, we are of opinion, that the jury were properly instructed at the trial; and as their verdict does not conform to their instruction in point of law, it is set aside, and a new trial granted.