### CARLYLE v. SLOAN.

[75 Pac. 217.]

44    357,
47    181,

BOUNDARIES—VENDOR AND PURCHASER—ESTOPPEL.

1. The owner of urban property near the Pacific Ocean platted the same and directed a surveyor to lay out the addition in lots and blocks, the owner intend- ing that the west boundary of the subdivision should extend to the east boundary of the tide land belonging to another, which was supposed to be the government meander line of the ocean. The surveyor, however, so surveyed the tract as to leave a strip of land between high-water mark and the west line of the blocks as actually surveyed, but his plat as filed did not show such strip, representing the ocean as the west boundary of the land. Thereafter defendant, who was the owner's agent, caused copies of the recorded plat to be made for exhibition to intending purchasers, and a sale of all of the west lots of the addition was made to plaintiff based on such plat, all the parties believing at the time that the west line of the block extended to high-water mark. Thereafter the error was dis- covered, and defendant, after representing to the previous owner that plaintiff did not want the intervening strip, succeeded in purchasing the same from him, and attempted to take possession of it, whereupon the purchaser sued to quiet her title. *Held*, that plaintiff was quite justified in relying on the plat, and that de- fendant, having purchased after her, took only such rights as his grantor had, and, like him, was estopped to deny the correctness of the plat.

VENDOR AND PURCHASER—NOTICE OF MISTAKE IN PLAT.

2. Where a plat of city lots showed them to extend to the high-water mark of the Pacific Ocean, and plaintiff purchased the lots without noticing the figures on the map indicating the size thereof, and such figures would not necessarily convey information that the lots purchased did not extend to the ocean, plaintiff was not put on inquiry by such figures as to whether the lots extended to high- water mark.

ESTOPPEL BY SURVEY—NATURAL BOUNDARIES.

3. Where, on a sale of lots, a plat showing the lots to extend to the Pacific Ocean was used in the negotiations for the purpose of determining the bound- aries thereof, and there was no evidence that the purchaser's attention was called to survey stakes in the ground which would have disclosed a strip extending be- tween the western boundary of the lots as surveyed and high-water mark, the purchaser was not bound by such stakes.

PLEADING—AIDER BY DECREE—OBJECTIONS AFTER TRIAL.

4. Where, in a suit to remove a cloud on title to certain lots, the facts pleaded were sufficient to raise an estoppel against the defendants, plaintiff's failure to allege that by reason of such facts defendants were estopped to assert title to the property in question as against plaintiff was immaterial in equity after answer and trial.

From Clatsop: THOMAS A. MCBRIDE, Judge.

This is a suit by Clara S. Carlyle against Katherine E. Sloan and Chas. K. Henry to remove a cloud from title and to enjoin the defendants from trespassing upon or asserting any claim to certain real property. In 1898 Thomas D. Honeyman owned a tract of land in Clatsop County, which he laid out and platted into lots, blocks, and streets, dedicating the same as "Ocean Grove Annex." This tract was about 208 feet wide north and south, and from 1,000 to 1,100 feet long east and west, and was bounded on the east by the Necanicum River and on the west by the Pacific Ocean. It was laid out with one street extending east and west and one north and south, making four blocks of ten lots each. The lots extended through the block, and were numbered from 1 to 10 respectively, beginning at the east end of the block. The tide land west of Honeyman's property was owned by E. M. Grimes. A surveyor employed to lay out the town was directed to include therein all of Honeyman's property, but, supposing that Grimes' tide land extended to the government meander line, he adopted that as the west boundary of the tract, thereby leaving a strip of land about 100 feet wide between high-water mark and the west line of blocks 2 and 3 as actually surveyed and laid out. The plat of the town as made by the surveyor does not show the strip of land referred to, but represents the ocean as the west boundary of the blocks 2 and 3. The description in the dedication states that the north line of the land platted extends "west to the Pacific Ocean," and the west line runs "southerly with the meanderings of said ocean." The lots shown on the plat are 40 by 90 feet in size, except the fractional ones along the river on the east and the ocean on the west. The width of the lots along the river is not shown on the plan, but the north line of lot 10 in block 2 on the ocean is stated to be 38 feet, and the south line of lot 10 in block 3 is 91.18 feet. About

the time the property was laid out and platted Honeyman appointed Charles K. Henry his agent for its sale. Henry caused a plat or map to be made for exhibition to intending purchasers, which shows the property to be bounded on the west by the ocean, and, so far as any question in this case is concerned, is the same as the one made and filed by Honeyman, except that the two lots fronting the ocean are shown to be relatively much wider than on the original, and considerably wider than the figures on either map would indicate. In 1896 the plaintiff and her sister, Mrs. Carlyle, purchased of Henry, as agent for Honeyman, two lots, upon which they constructed a summer boarding house. Henry thereafter sold some of the lots in blocks 2 and 3 to other persons, and in August, 1900, sold to the plaintiff the remainder of the property in the town, consisting of about 27 lots, including those fronting and abutting upon the ocean. She immediately went into possession, and subsequently paid the purchase price, and received a deed from Honeyman describing the property as certain blocks and lots in Ocean Grove Annex, "according to the recorded plat thereof in the office of the recorder of conveyances for said Clatsop County."

Some time afterwards, during negotiations with Grimes for the purchase of the tide land in front of Ocean Grove Annex, Henry learned that it was not true that the town extended to the ocean, as indicated by the map used by him in the sale of the property to the plaintiff, and in reliance upon which plaintiff purchased, but that Honeyman still owned a strip about 100 feet wide between the west line of blocks 2 and 3 and the ocean. He thereupon sought to purchase the same from Honeyman, who, being assured by him that it was not wanted by the plaintiff, sold and conveyed it by deed to the defendant Sloan at his request. Thereafter, as the agent and representative of Mrs. Sloan, he attempted to take possession of the property and con-

struct a fence thereon, and this suit was brought. The complaint, after describing the location of the property, the making and dedication of the map or plat thereof by Honeyman, the sale of the lots fronting on the ocean and other property to plaintiff, avers that during the negotiations for the sale Henry represented to her and "to her agent in the purchase of said property that said lot 10 of said block 2 and said lot 10 of said block 3 fronted upon and extended to the Pacific Ocean, and said Charles K. Henry, acting as such agent, produced and showed to plaintiff and to her agent in the purchase of said lots and blocks maps and plats of Ocean Grove Annex, whereon said lots were shown to front upon and to extend to, and as being bounded on the west by, the Pacific Ocean, and represented to plaintiff and to her said agent that said maps and plats were correct maps and plats of said Ocean Grove Annex; all of which representations were believed and relied upon by plaintiff in making the said purchase of said lots and blocks, and was an inducement for plaintiff to purchase said lots and blocks." The answer admits the platting of the land by Honeyman, the agency of Henry, and the sale to plaintiff, but denies the representations alleged in the complaint, and for an affirmative defense avers, in substance, that at the time the purchase was made the plaintiff was shown the property, and made an examination thereof; that the stakes set by the surveyor indicating the corners of the lots were then in place and visible; that such stakes showed the line of blocks 2 and 3 to be 120 feet east of the high-water mark of the Pacific Ocean; that at the time of the purchase the plaintiff and her agent well knew and admitted that the lots did not extend to or abut upon the ocean, but knew that there was a tract of land lying between the west line thereof and the ocean, which was not included within the boundaries of Ocean Grove Annex, and was not intended to be included

in the sale to the plaintiff. The reply put in issue the allegations of new matter in the answer, and upon the trial a decree was rendered in favor of the plaintiff.

AFFIRMED.

For appellants there was a brief over the names of *Otto J. Kraemer* and *Chamberlain & Thomas*, with an oral argument by *Mr. Kraemer* and *Mr. Warren E. Thomas.*

For respondent there was a brief over the names of *Frank J. Taylor* and *Carey & Mays*, with an oral argument by *Mr. Charles H. Carey.*

MR. JUSTICE BEAN, after stating the facts in the foregoing terms, delivered the opinion of the court.

It appears from the evidence to be practically undisputed that at the time of the sale to the plaintiff of the then remaining property in Ocean Grove Annex it was understood by all parties that it extended to and was bounded on the west by the ocean. Honeyman says that he supposed that lots 10 in block 2 and 10 in block 3 extended to the west line of the property owned by him; that he did not know there was any land between them and high-water mark; that he intended to sell and supposed he had sold to the plaintiff all the land then owned by him; that he thought the figures on the plat indicating the size of the fractional lots fronting the ocean were sufficient to cover the space between their east line and the ocean, but did not consider the figures very material; that after the sale to the plaintiff Henry requested him to join in a deed with Grimes for the ocean frontage, in which he then had an interest, but he declined to do so because it was understood that purchasers of lots in Ocean Grove Annex should have the right to use the beach; that later Henry advised him, to his surprise, that the property he desired to purchase did not belong to Grimes, but to him; that he supposed the surveyor had laid out all the land to which he

was entitled in lots and blocks, and therefore he would not make or execute the deed as requested by Henry; that he supposed the property Henry wanted would go to the plaintiff under her purchase; that he asked Henry about it, and Henry afterward told him that he had seen the plaintiff, and that she did not want the property; that he thereupon, at Henry's request, made a deed conveying to the defendant Sloan whatever property he might own between the west line of blocks 2 and 3 and the ocean for the consideration of $100; that he did not know Mrs. Sloan, and never had any conversation with her.

A. C. Emmons testifies that Henry prepared a deed for Honeyman to execute, describing the strip of land in controversy by metes and bounds, but that Honeyman refused to sign it because he was not sure that he owned any such property; that he (the witness) explained the matter to Henry, and himself prepared a deed, the description of which was so worded as to convey whatever land, if any, Honeyman had, and, if he had none, the description would simply follow the west line of blocks 2 and 3 and return on the same.

Mrs. Carlyle, who was the agent of the plaintiff in making the purchase, and who transacted all the business in connection therewith, testifies that early in 1900 Henry requested her to buy all the property then owned by Honeyman in Ocean Grove Annex; that, after examining the property, she made him an offer for it, which was accepted; that before the purchase she and Henry counted the number of lots on a map or plat furnished by him, and looked over the ground; that for some time prior thereto she had had her bath houses just inside the high-water line, and was buying the ocean frontage, to be used for her bath houses, and to prevent the construction of buildings thereon which would obstruct the view from her boarding house; that nothing was said between her and Henry at the time about

the size of the west lots, but she thought and understood that she was buying all the remainder of the Honeyman tract; that before the purchase Henry gave her a map or plat of the property, showing the lots and blocks thereon, which he had prepared for exhibition to purchasers, and it was used at the time; that lots 10 in block 2 and 10 in block 3 were both ocean lots, and not worth very much, and Henry told her at the time that she would have to sell the inside lots for a higher price to make up the deficiency; that some time after her purchase Henry told her that he claimed there was a strip of land between the west line of the property sold to her and the ocean, which belonged to Honeyman; that she asked him if he did not sell her all the Honeyman tract up to high-tide mark, and he said he thought he did, and such was his intention; that Henry asked her to purchase the property now in dispute for $350; that in 1896, at the time she bought the property where her boarding house now stands, the lots purchased were staked out, but she does not know whether the other stakes were standing or not, as her attention was not called to them; that there were no stakes marking the corners of the lots next to the ocean at the time she bought the remainder of the tract from Henry; that at the time she and Henry went over the ground they did not look for the west line of blocks 2 and 3, nor was she shown any stakes marking the boundaries of lots; that in examining the property they walked out to the drift logs where her bath house was, and back to the river, but she did not look for stakes; that she never had any conversation with Henry about the boundaries of the lots, and never measured any of them; that she knew from an examination of the map that the ocean lots were larger than the ordinary lots, and irregular in shape, because it so appeared thereon; that she intended to buy, and thought she was buying, to high-water mark; that she was not advised by Henry or any

one else that the lots did not extend to that point; that when Henry asked her $350 for the disputed strip she told him she thought she had bought it, but, if there was any land between her property and the ocean, she would buy it, although she did not think it necessary to buy the same property twice; that soon after she purchased the lots where her boarding house stands Grimes ran a fence along the east side of the tide land, cutting her off from access to the beach, and that Honeyman bought her a right of way over and across the tide land ; that the fence built by Grimes was just inside the drift wood, and her bath house was just inside the fence; that the fence was torn down some time prior to her purchase of the remainder of the Honeyman tract, but some of the posts were still standing at that time.

Miss Carlyle testifies that she bought the fronting on the ocean because she needed it for her bath houses, and to preserve the view from the boarding house; that at the time of the purchase she knew nothing about there being any stakes marking the boundaries of the ocean lots, or that there was any other property between her purchase and the ocean ; that Grimes' fence was inside the drift logs, and about high-water mark.

Henry testifies that about August 1, 1900, after considerable negotiation, he sold to the plaintiff, through Mrs. Carlyle, all the property in Ocean Grove Annex then owned by Honeyman ; that prior to that time he had given her a map of the town, with the size and prices of the lots marked thereon, so she could aid him in selling the property ; that when he first went down to the property in 1897 or 1898 the stakes set by the surveyor marking the corners of the lots were visible; that in June prior to the purchase by the plaintiff he went out over the land with her agent, Mrs. Carlyle, beginning at the beach and going back to the river; that they did not pay much attention to the

beach frontage, as it was thought only the lots in the grove
were valuable; that they figured out the size of the lots
and the number she would get for her money; that they
saw one or two of the stakes on the line between lots 9 and
10 in block 2—he was not sure which, but thinks they
were at the southwest corner of 9 and the southeast corner
of 10; that he and Mrs. Carlyle took the plat and went
over the lots; that nothing was said about the west bound-
ary, or the size of lots 10 in block 2 and 10 in block 3 at
that time; that about a year prior thereto Mrs. Carlyle
had attempted to sell lot 10 to a Mrs. Maxwell, and at that
time the size of the lot was discussed, and attention called
to the fact that it was larger than an ordinary lot; that it
was understood by them at the time of the sale to plaintiff
that Grimes owned up to Ocean Grove Annex. He denies
that he represented or stated to Mrs. Carlyle that blocks 2
and 3 extended to the ocean, but says that he supposed
that Grimes owned the property in front of them; that it
was the understanding of all the parties at the time of the
sale that the Grimes tract and Ocean Grove Annex ad-
joined each other, and it was six months later that the
mistake was discovered.

Mr. Hubbard, who was employed by Henry to fence the
tract in dispute after it had been conveyed to Mrs. Sloan,
testifies that the fence run by him along the west side was
only four or five feet west of the line of the fence built by
Grimes some years before to inclose his tide land, and that
the bath houses of the plaintiff were on the land in dis-
pute, and near the line of Grimes' fence.

1. From this testimony it is manifest that at the time
of the sale by Henry to the plaintiff all parties understood
and believed that the sale included all the remainder of
the Honeyman tract, and extended up to the east line of
Grimes' tide land. All the witnesses so testify. Henry
says that such was the understanding, but that he thought

Grimes' land extended to the west line of Ocean Grove Annex, as surveyed and marked out by the surveyor. He does not say, however, that he pointed out to the plaintiff's agent the surveyed west line of Ocean Grove Annex, and advised her that Grimes' land extended to that point, or that she so understood. The location of the west line was not discussed or referred to in the negotiations, and the posts set by Grimes for his fence indicate clearly that he made no such claim. It is but reasonable to infer, therefore, under the circumstances, that Mrs. Carlyle believed, and, indeed, all parties believed, that Ocean Grove Annex extended in fact up to the line of the Grimes fence, and included the property now in controversy. Upon the evidence, therefore, the equities are with the plaintiff. She understood that she was buying to the ocean, and both Honeyman and Henry intended to sell to her all the remainder of the Honeyman tract, and supposed and believed they had done so. It is insisted, however, that, notwithstanding this evidence, she did not purchase or acquire title to any property not included within the town as actually surveyed and marked out upon the ground, because the sale and conveyance were made by reference to lots and blocks. As already stated, the plat or map as prepared by the surveyor and acknowledged and recorded by Honeyman, as well as the copy thereof prepared by Henry for exhibition to intending purchasers, shows the ocean to be the west boundary of the property, although, as actually surveyed and laid out on the ground, it did not extend to the ocean by perhaps 100 feet.

As a general rule, where there is a variance between a map or plat of a town and the survey as actually made upon the ground, a grantee under a conveyance made by reference to the plat only takes according to the actual survey: *Bean* v. *Bachelder*, 78 Me. 184 (3 Atl. 279); *Williams* v. *Spaulding*, 29 Me. 112; *Thomas* v. *Patten*, 13 Me. 329;

*O'Farrel* v. *Harney,* 51 Cal. 125 ; *Turnbull* v. *Schroeder,* 29 Minn. 49 (11 N. W. 147); *Root* v. *Cincinnati,* 87 Iowa, 202 (54 N. W. 206). This rule is applicable in determining the legal rights of successive purchasers of lots and blocks in a platted town, but we are not dealing here with such a case. The question is whether, under the circumstances as disclosed by the testimony, the defendants should be permitted to assert title to the land in controversy as against the plaintiff. The case stands in this aspect the same as if Henry had been the original owner of the Honeyman tract, and had himself sold and conveyed the land to the plaintiff by reference to the plat thereof, without any knowledge on her part of the actual boundaries of the property as marked out on the ground. Henry was the agent of Honeyman, and negotiated the sale. He was also the agent of the defendant Sloan in negotiating the purchase by her of the disputed tract. So the case stands the same as if it were a question between the purchaser of lots and blocks in a town who relied upon a map or plat thereof describing and defining the boundaries of the lots purchased by him by natural monuments or landmarks and one who promulgated the map or plat. In such case "the purchaser will not be held at his peril to ascertain whether or not the plat agrees with the original survey of the land subdivided and platted ; but he is justified in assuming that the plat is correct, and that the lot or lots purchased by him are of the dimensions and bounded by the courses and distances as indicated on the plat, to which, for particulars, his deed must refer, when the lot number alone is given in the deed ": *Whitehead* v. *Atchison,* 136 Mo. 485 (37 S. W. 928). The complaint alleged that at the time of the sale Henry represented that the lots extended to the ocean, and exhibited a map showing that fact, and, relying thereon, the purchase was made by the plaintiff. These allegations are supported by the testimony.

It is true Henry did not expressly state to the plaintiff's agent at the time of the sale that the land extended to the ocean, but the map made and exhibited by him, and upon which the plaintiff relied, was a continuing statement to that effect, equally as persuasive as his words would have been. He was offering to sell to her all the remainder of the Honeyman tract. The map which was used showed that the property extended to the ocean, and he did not advise the plaintiff to the contrary. No representations could have been made by him more likely to induce the purchase, or more strongly justifying the interposition of a court to prevent him or his principal, with knowledge thereof, from profiting by the mistake.

2. It is argued that, because the size of the lots fronting upon the ocean was marked upon the plat, it was evident therefrom that they did not extend to high-water line. There is no evidence, however, that the plaintiff ever noticed the figures on the map indicating the size of the lots, and, if she did, it would not convey to her information that the lots did not extend to the ocean. She would have had no more reason to suppose that the initial point of the survey was on the river than that it was on the ocean ; and, if the survey had commenced at the ocean and run east, then the figures showing the width of the lots would have indicated the distance of the east boundary thereof from the ocean.

3. Again, it is said that at the time of the sale the original stakes set by the surveyor on the west line of lots 10 in block 2 and 10 in block 3 were still standing and visible. This contention is based upon the evidence of Henry. We have read his testimony with care, and are not clear just what he intended to say. It is difficult to segregate what occurred at the time of the sale from that in reference to some measurements made by him after he discovered that Grimes' tide land did not extend to the west boundary of

Ocean Grove Annex as surveyed and marked out on the ground. The witness Hubbard, who was employed by Henry a few months after the sale to fence the property, says that he dug up a stake at the northwest corner of lot 10 in block 2, which was buried a foot under ground, and was so marred and disfigured by time and the elements that it was scarcely possible to tell that it had ever been painted. But if the stakes were standing at the time of the sale to the plaintiff it would be of little value in this case. There is no evidence that the plaintiff's attention was called to them, or that she was advised that they were the west boundary of the land offered for sale. All parties to the transaction were familiar with the location of the land, and the question of boundaries was not a subject of consideration. The map used at the time showed that the property was bounded on the west by the ocean and on the east by the river, both permanent and visible landmarks, and there was no occasion for the purchaser or the seller to be concerned about the actual boundaries of the property. All the lots that had been previously sold by Henry were marked upon the plat used by the parties at the time, so that their general location was known, and, as the plaintiff was purchasing the remainder of the tract, it was not necessary to be particular about the actual boundaries.

4. And, finally, it is said that estoppel is not pleaded. The facts are set out in the complaint, and the failure to allege that by reason thereof the defendants are estopped to assert title to the property in question as against the plaintiff is not fatal after trial. Equity is not governed by such technical rules. Where facts which entitle the plaintiff to the relief sought are set out in the complaint and sustained by the testimony, the relief will, after answer and trial, be granted, notwithstanding the complaint

44 Or.——24

may lack some of the requisites of a technical pleading: *McCall* v. *Porter*, 42 Or. 49 (70 Pac. 820, 71 Pac. 976). The plaintiff in this case in purchasing the property relied upon the map as exhibited by Henry and the general understanding of all the parties, and it would now be inequitable and unjust to allow either Henry, or any one for whom he might act, to profit by the mistake. The decree of the court below is therefore affirmed.      AFFIRMED.

---

Decided 11 January, rehearing denied 1 March, 1904.