Motion to dismiss appeal denied September 7, 1915.
Argued on the merits January 16, affirmed February 6, 1917.

## GRAND PRIZE HYDRAULIC MINES v. BOSWELL.*

(151 Pac. 368; 162 Pac. 1063.)

**Appeal and Error—Filing of Transcript—Premature Filing.**
1. Where no exceptions were taken to the sufficiency of the sureties on an undertaking on appeal, filed and served on the day of the filing and serving of notice of appeal, a transcript filed two days later was not prematurely filed, and the court could not dismiss the appeal on that ground.

**Appeal and Error — Filing of Transcript — Jurisdiction of Appellate Court.**
2. Under Section 554, L. O. L., providing that, on an appeal being perfected, appellant shall, within 30 days, file a transcript, an appeal may not be dismissed where, within 30 days after perfecting the appeal, an abstract was filed, containing all that the rules of the Supreme Court required to be included therein, and hence ample to give the court jurisdiction.

**Appeal and Error—Filing of Transcript—Premature Filing.**
3. An appeal may not be dismissed, on the ground that the transcript was prematurely filed, where it was required on appellant's application for a restraining order pending the appeal.

ON THE MERITS.

**Mines and Minerals — Public Mineral Lands — Nature of Right Acquired.**
4. A person, locating mining claims under Sections 3901–3906, L. O. L., acquires only a temporary possessory right, subject to divest-

---

*Authorities discussing the different phases of the question of location of mining claims are gathered in a comprehensive note in 7 L. R. A. (N. S.) 763.                                REPORTER.

ment by failure to purchase or lease lands under regulations of state land board.

[As to discovery of minerals in mining claims and rights of locator prior thereto, see note in 139 Am. St. Rep. 154.]

**Public Lands—Distinction Between State and Federal Lands.**

5.   A distinction exists between the policy of the federal government and the Oregon state government regarding the taking up of public lands, the former being for purposes of development and the latter to provide funds for the public school system.

**Estoppel—Boundaries of Mining Claims.**

6.   Where plaintiff assisted defendant in entering a mining claim actually within his own staked claim and, upon defendant striking "pay-dirt," admitted in presence of witnesses that the claim belonged to defendant and offered to buy it, and in view of other testimony offered, *held* that plaintiff was estopped from claiming the property.

**Estoppel—Mining Claims.**

7.   Where the son of an entrant of mining claims acquiesced in his father's actions which estopped the latter from claiming lands entered by defendant, and the son making no objection to defendant's location of the claim, the son also is estopped from claiming the disputed land.

**Estoppel—Ownership of Mining Claim.**

8.   Where a person, furnishing money for plaintiff's use in buying mining claims, asked to be made a defendant in a suit for lands entered by defendant within plaintiff's boundaries, and asserted the validity of defendant's title, he could not assert any claim himself to the disputed property.

**Mines and Minerals—Assignment of Mining Claim—Rights of Assignee.**

9.   The assignee of a mining claim cannot claim any rights superior to those of his assignor, unless he be an innocent purchaser for value.

**Frauds, Statute of—Mining Claims—Verbal Option.**

10.   In view of Section 5132, L. O. L., making a mining claim real property, an interest therein cannot be created by verbal option.

**Mines and Minerals—Option for Purchase of Mining Claim—Estoppel of Assignee.**

11.   In view of evidence offered in dispute over mining claim, the assignee of a contract, which was an option for purchase of mining lands, *held* not to be an innocent purchaser, and an estoppel, operating against assignor, will also estop assignee.

**Mines and Minerals—Option for Purchase of Mining Claim.**

12.   A contract, giving possession and right to purchase mining property, but with right to terminate the contract, *held* to be an option of purchase.

**Pleading—Pleading Legal Effect—Construction on Appeal.**

13.   Where defendant's answer did not plead an estoppel, but pleaded facts constituting an estoppel, upon appeal they will be given their legal effect.

ON MOTION TO DISMISS.

From Josephine: FRANK M. CALKINS, Judge.

Statement by MR. JUSTICE BENSON.

This is a suit by the Grand Prize Hydraulic Mines, an Oregon corporation, D. K. Sutherland, T. M. Anderson and T. J. Anderson against R. Boswell, R. J. Boswell and W. A. Akers.

On May 11, 1915, plaintiffs filed and served a notice of appeal to this court, and on the same day filed and served an undertaking on appeal with the United States Fidelity & Guaranty Company as surety. Plaintiffs during the pendency of the suit in the lower court had obtained a temporary injunction restraining defendants from removing ore or minerals from the mines which are the subject of the litigation, and as the decree of the trial court was in favor of defendants, the decree also ordered the dissolution of the injunction, but, on account of the peculiar conditions existing, delayed such dissolution until May 14th, in order to enable plaintiffs to apply to this court for a similar restraining order, pending the appeal. Such application was made, and was heard by Mr. Justice HARRIS on May 13th, at which hearing the application was granted. On May 13th, prior to the hearing, a transcript on appeal was filed.

MOTION TO DISMISS DENIED.

*Mr. H. D. Norton* and *Mr. Gus Newbury,* for the motion.

*Mr. Alfred E. Reames* and *Mr. Bert Schlesinger, contra.*

MR. JUSTICE BENSON delivered the opinion of the court.

1-3. Defendants move to dismiss the appeal upon the ground that the transcript was prematurely filed, and rely upon the decisions of this court in the cases of *Graf* v. *Pearcy,* 76 Or. 488 (149 Pac. 532), and *Cook* v. *City of Albina,* 20 Or. 190 (25 Pac. 386). However, the facts upon which these decisions are based are widely different from those of the case at bar. In each of the cases cited, exceptions were taken to the sufficiency of the sureties, while in this case no such exceptions were ever filed. In addition, it may be noted that within thirty days after the perfecting of this appeal, an abstract was filed which contains all that the rules of this court require to be included therein, and is therefore ample to give this court jurisdiction: Section 554, L. O. L. But if it were otherwise, it is obvious that the transcript was necessarily required in the consideration of the application for a restraining order, and was therefore properly filed at that time.

The motion to dismiss the appeal is therefore denied.                    MOTION DENIED.

---

Affirmed February 6, 1917.

ON THE MERITS.

(162 Pac. 1063.)

Department 2.    Statement by MR. JUSTICE McCAMANT.

This is a suit to have respondents declared trustees for appellants of a right to possess and purchase from the state land board about two acres of school land valuable for mining purposes, in the northwest quarter

of lot 2, section 36, township 39 south, range 7 west of the Willamette Meridian, in Josephine County. From a decree dismissing the bill an appeal is taken to this court. At the inception of the litigation the dispute involved some additional land claimed by Mr. Sutherland, but respondents relinquished this property, and the only controversy has to do with the two acres of land above referred to.                           AFFIRMED.

For appellants there was a brief over the names of *Mr. Alfred E. Reames* and *Mr. Bert Schlesinger,* with an oral argument by *Mr. Reames.*

For respondents there was a brief with oral arguments by *Mr. H. D. Norton* and *Mr. Gus Newbury.*

MR. JUSTICE MCCAMANT delivered the opinion of the court.

It appears that on or about the fifth day of February, 1913, appellants T. M. Anderson and T. J. Anderson located a mining claim on the south half of section 36, township 39 south, range 7 west. The claim was called Grand Prize mine. A location notice was posted near the point where mineral was discovered. The claim was staked out on the ground and its corners were marked. The location notice was sworn to on the 2d of April, 1913, and recorded on the same day in the records of the Illinois mining district, in which the property is situate. It was recorded on the 5th of April in the mining records of Josephine County. The claim as marked by appellants Anderson included the property in dispute in this case, but a careful survey, based on the description, contained in the recorded notice shows that this description does not cover the property in dispute. The section of land on which the location

was made was school land belonging to the State of Oregon, and appellants Anderson were operating under the authority of Section 3901 to 3906 of Lord's Oregon Laws. Section 3901 is as follows:

"Any citizen of the United States, finding precious minerals upon any unsold lands of the State of Oregon may apply to the state land board for a lease of any amount of land not to exceed the amount and dimensions allowed by the mining laws of the state and the United States."

Section 3902 provides in part as follows:

"The manner of locating a mineral claim upon state land shall be in accordance with the law of the state regulating the location of mineral claims on government lands."

Subsequent sections of the Code provide the terms on which such claims may be leased and limit the amount of ore which may be taken from them by the lessees.

4, 5. Appellants contend that under these sections of the Code the locator of a mining claim on state school land acquires a possessory right equivalent to that granted by the federal land laws to a locator on the public domain. We think that there is a distinction based on the variant policy of the federal government and that of the State of Oregon with reference to their lands. The federal government has long since ceased to administer the public domain with a view to the profitable disposition of public lands. The effort is rather to promote the development of the country, and to that end to insure that the public lands shall pass into the hands of actual settlers. On the other hand, the school lands granted to the State of Oregon are a trust for the benefit of public education. It is the duty of the state to dispose of them for as near their full value as may

be, and to create thereby a continuing fund for the maintenance of public schools. The act providing for the disposition of state lands has this object in view for its paramount purpose, and the better to effectuate this purpose the board of school land commissioners is empowered to make rules and regulations to carry out the provisions of the act. The right to locate a mineral claim on state lands is granted to facilitate the advantageous sale of such lands. We think, therefore, that when appellants Anderson located the Grand Prize mining claim they acquired only a temporary possessory right, subject to be divested by a failure to purchase or lease the property in accordance with such reasonable regulations as the state land board might prescribe.

The location of these appellants is attacked on several grounds, but we shall assume for the purposes of this opinion that the location was valid, and that the locators acquired thereby the rights incident to a mineral location on state lands. We shall also assume that the claim as located included the property in the northwest quarter of lot 2 in section 36, which is in dispute in this case. For the proper understanding of what follows it should be said that lots 1, 2, 3 and 4 are the southerly subdivisions of the section; that they each contain slightly in excess of 40 acres of land, and that lot 1 is in the southwest corner of the section, the other lots extending in an easterly direction respectively therefrom. Appellants Anderson after locating the mine continued to work it, taking out enough gold to pay their living expenses. Their development extended well over the property, and included at least two diggings on the portion of the property in dispute in this case.

It appears that at a meeting of the state land board held on April 22, 1913, action was taken, directing the clerk to notify the holders of mining claims in the section in question that they must either purchase or lease the lands claimed, and that in default of such purchase or lease the lands would be offered for sale to the first applicant. A letter to this effect was written by the clerk of the state land board under date of April 24, 1913, to appellant Sutherland, and the contents of this letter were made known by Mr. Sutherland to T. M. Anderson. As the result of this notification, T. M. Anderson, under date of June 11, 1913, applied for the purchase of the north half of lots 3 and 4 in section 36. After some correspondence with the clerk of the state land board the application was accepted and on July 15, 1913, a contract was entered into with him for the purchase of this property for $600, $120 of the purchase price being paid in cash. On receipt of this contract, under date of July 21, 1913, Mr. Anderson wrote the clerk of the state land board the following letter:

"I received the recept and certificate for the purches of 40 acers in Lot 3 and lot 4 of section 36, it is all right onley it cuts me short in the length of my two mining claims and leaves out the west end whare I am working and if you will sell me 660 feet by 660 feet making 10 acers in lot 2 joining the west end of my claims it will make my claims all most as they are located what makes it short you bound me to the section line, I am a poore man and have worked hard on this ground and I think you can fix it so I can have the 10 acers in lot 2 and make the payments from next year on. Please let me know."

On July 23d the application blank was forwarded to Mr. Anderson, and under date of July 27th he acknowledged receipt of the blank in the following letter:

"I received the application blank for the 10 acers in lot 2 and it is all right.   It will make my ground complete.   I will return it with $30.00 inside of 30 days and I trust that will be all satisfactory."

Under date of August 11th, Mr. Anderson applied in his own name for a 10-acre tract substantially equivalent to the northeast quarter of lot 2 in section 36. This application was allowed by the state land board, and a similar contract of purchase was issued to Mr. Anderson.   In transmitting the $30 required to make the first payment on this purchase, Mr. Anderson inquired of the clerk whether there were any applications for the purchase of lot 1 or the rest of lot 2 in section 36.   He was advised that up to August 14, 1913, the board had received no such applications.   The 50 acres so purchased included most of the land located as the Grand Prize claim, but did not include the 2 acres which is the property in dispute.   Mr. Anderson made no further attempt to purchase the property in the portion of section 36 with which we are concerned in this case, but on October 16th he made an application to purchase from the state land board 48.73 acres of land lying north of lots 2, 3 and 4 in this section, and this application was also allowed by the state land board.   We think it is significant that Mr. Anderson made no effort to purchase the northwest quarter of lot 2.   There is evidence in the record, other than the foregoing correspondence, to the effect that Mr. Anderson had abandoned all idea of buying this land.

The evidence is very conflicting as to whether Mr. Anderson thought that his purchase from the state included all the land which he had staked off as included in the Grand Prize location.   We do not find it necessary to determine this disputed question of fact.   It appears that respondent R. Boswell came into the

neighborhood on August 9, 1913, and remained there until September 8th. While he was in the neighborhood appellant T. M. Anderson advised him to buy from the state the property immediately adjoining on the west that which Mr. Anderson had purchased. We quote from Mr. Boswell's testimony:

"Q. Right now go ahead with your statement about his advice to you with reference to the purchase.

"A. He advised me to purchase land adjoining him on the west, said it was a good buy, and that he had bought all he wanted, he told me that first he had bought 40 acres and found that he had bought short; that they measured there, him and Bill Akers or his son—I think it was Bill Akers, he said, measured with him, and found that 40 brought him just to his panning hole or about that, and that he had written the state land board and they had consented, and I think at that time his application was in for 10 acres more, and he said that 10 acres would be all of the land he wanted."

Subsequent to the foregoing interview another interview took place, which is described by Mr. Boswell as follows:

"Q. Now in the meantime during the—from the time you had moved back to your old camp up to the 8th of September, did you have any talk or conversation with Mr. Anderson?

"A. I did. * * The evening of the 6th or 7th him and Uncle Dan Sutherland came over the trail from Holland and came by the camp, and Anderson advised me then if I was going to buy any of this land that I had better get busy and do it or I would get left. * *

"Q. Well, what steps did you take, if any, toward the purchase of any land?

"A. I told him, very well, I would, and he said we would better come down the next day, and he would help me; he had an application blank there, a blank one, and he would make a plat or help me make one of

the land that we both thought that I had better take, and that I had better go out and send it at once.

"Q. Now, Mr. Boswell, before this time did he say anything to you with reference to these lands as to their values for prospecting and mining purposes?

"A. Yes, sir.

"Q. What did he say about that?

"A. He said it was a good buy, and that he had struck it good there, and was going to make some money, and that some day him or somebody else, whoever he sold it to, would find the ledge above him that too is placer. It was his opinion and pretty near all mining men that that slough had come from quartz some place above, and when that was found, and that the land adjoining him, if nothing was ever found on it, would be worth some money, any way a few thousand dollars if they struck it rich on the claim.

"Q. Did you say that there was an application prepared at that time?

"A. Yes, sir. * *

"Q. Who prepared it?

"A. T. M. Anderson made a plat of the land we concluded I had better apply for, and the next morning him and William Akers and myself went down to a neighbor's about four miles below, and the neighbor filled out the application, and T. M. Anderson and Mr. Akers witnessed it.

"Q. Well, do you say that the neighbor filled out the application; what do you mean by that—did the neighbor insert the description?

"A. Yes, sir, from the plat.

"Q. At whose direction?

"A. At T. M. Anderson and myself, at our directions.

"Q. Were you as familiar with the descriptions up there as Mr. Anderson was?

"A. No, sir.

"Q. State whether or not you relied upon the descriptions which he suggested to you.

"A. I did.

"Q. And were those descriptions included in the application?

"A. Yes, sir."

It appears that the application referred to in the foregoing testimony was amended by Mr. Boswell in order to meet the views of the state land board as to the property which it could properly sell him, and that finally, on November 21, 1913, he presented an application for the purchase of 57.05 acres of land including the northwest quarter of lot 2 in section 36, which covers the property in dispute in this case. This application was accepted, and a contract for the sale of this land was executed in favor of Mr. Boswell. Mr. Boswell's further testimony in regard to the matter is as follows:

"Q. At whose suggestion did you make that application?

"A. T. M. Anderson's.

"Q. State whether or not he gave you the descriptions to fill out that application.

"A. He did.

"Q. What was it that he told you that induced you to apply for those particular lands?

"A. He told me that the land was for sale, and they was going to lose it as they wasn't going to buy it from the state, he had understood that somebody would buy it, and I might as well have it, as somebody else."

The foregoing testimony is corroborated by other witnesses, and can scarcely be said to be controverted. The name of T. M. Anderson appears on the first application presented by Mr. Boswell to the state land board under date September 8th. Mr. Anderson's contention about the matter is that he entertained a mistaken view of the law, and was under a misapprehension as to the correct boundaries of the land which he had purchased from the state. We think that his

views of the law were not materially at fault, and that if he was in error as to the boundaries of the property which he had purchased, the error was a negligent one into which he would not have fallen if he had exercised any reasonable degree of diligence.

Mr. Boswell left the neighborhood on September 8th and did not return until December 27th. He testifies that he made a pocket compass survey of the property which he had purchased from the state, some time during the week intervening between Christmas and New Year's Day. In January, 1914, Mr. Boswell and his son, R. J. Boswell, began to work the property in dispute, and continued to work thereon during the months of January and February; during the first week of March they ran into a rich pocket of pay-dirt. During all of the time when the Boswells were working on the property in dispute, the work was in plain sight of the Grand Prize mine and in the immediate vicinity. Both T. M. Anderson and T. J. Anderson saw the work as it proceeded from day to day, and were well aware that the place where the Boswells were working was within the boundaries of the Grand Prize mine as staked out by them.

While there is some conflict in the testimony, the preponderance of the testimony is greatly to the effect that no objection was offered by anyone to the work which the Boswells were doing. A few days after Mr. Boswell had made his strike Mr. T. M. Anderson admitted in the presence of four witnesses that the strike was on Mr. Boswell's property and expressed pleasure at Mr. Boswell's good fortune. In the presence of these same four witnesses Mr. Anderson made an offer to buy the property from Mr. Boswell.

6. In view of the foregoing facts we have no hesitation in holding that appellant T. M. Anderson is

estopped from claiming the property in dispute as against R. Boswell and his son, R. J. Boswell, who claim under him. The case is not to be distinguished from *Sharkey* v. *Candiani,* 48 Or. 112, 126 (85 Pac. 219, 7 L. R. A. (N. S.) 791). In this case two of the owners of the Louise and the Lucky Boy No. 4 mining claims marked out a claim for the defendant which he located as the Doctor lode. The defendant worked this claim for a time with the knowledge of the owners of the Louise and Lucky Boy No. 4 claims and without objection on their part. After the defendant had discovered a valuable body of ore, an investigation was made, and it was found that the Doctor claim encroached on the Louise and Lucky Boy No. 4 claims, and that the defendant was trespassing on plaintiffs' property. The court found that all parties had labored under a mistake as to the true boundaries of the Louise and Lucky Boy No. 4 claims, but that the owners of these claims were nevertheless estopped to assert title to the property in dispute. The court, speaking through Mr. Justice MOORE, said:

"Experience in the mining regions teaches that locations of mineral-bearing rock are frequently made on public land for speculative purposes only, and are often considered of little value until paying ore is discovered in the immediate vicinity, when, without any expense to the locators, they may become of immense worth. Such possible fluctuations in value demand a different rule from that which usually governs vested estates in land, and necessitates immediate assertion of inchoate rights in mining claims, when, by the exercise of reasonable diligence, the locators could have discovered that their premises were being invaded. Dyson, Standish and Frank and Fred Sharkey, who are experienced miners and should have known the location of the boundaries of the Louise and of the Lucky Boy No. 4 mining claims, ought to be estopped to assert that they

had any interest therein in conflict with the claim of Candiani as originally indicated on the ground. To allow them to assert an adverse claim to that part of the Doctor lode now in controversy, as it should be surveyed, would be violative of every principle of equity and result in rewarding them for encouraging the development of the property.''

The foregoing case does not stand alone, but is in harmony with a number of other decisions of this court. In *Bloch* v. *Sammons,* 37 Or. 600 (55 Pac. 438, 62 Pac. 290), it was held that a party who encourages another to buy at execution sale is estopped to dispute the title of such execution purchaser; the fact that the encouragement is given under a mistaken view of law does not relieve from the estoppel.

In *Clark* v. *Hindman,* 46 Or. 67, 75 (79 Pac. 56), the facts were as follows: Plaintiff's father had conveyed to her certain property in Baker; he pointed out to her the line dividing the property conveyed from other property which he retained, and plaintiff, in reliance on these representations, built a house on the property supposed to be conveyed. It subsequently transpired that plaintiff's house extended beyond the true boundaries of her land. Plaintiff's father conveyed to the defendant who sought to eject plaintiff from the premises on which she encroached. It appeared that the representations on which plaintiff had acted were made as the result of an honest mistake. The defendant was nevertheless held to be estopped. The court said:

''When a party, under a misapprehension of his legal rights, by word or act, places another party in an attitude of hostility to such rights, he must submit to the loss which his conduct has occasioned: *Fahie* v. *Pressey,* 2 Or. 23 (80 Am. Dec. 401). Hindman, in ignorance of his own title, evidently encouraged plaintiff in expending money to build her house, and, having done so,

he and those claiming under him cannot subsequent thereto assert such title to her injury.''

To the same effect are *Ashley* v. *Pick,* 53 Or. 410, 417 (100 Pac. 1103) ; *Bush* v. *Roberts,* 57 Or. 169 (110 Pac. 790) ; *La Forest* v. *Downer,* 63 Or. 176 (126 Pac. 995).

7. The question remains as to whether the other parties interested in the Grand Prize mine are in a position to assert a claim to the property in dispute. The testimony shows that T. J. Anderson is the son of T. M. Anderson. At the time of the trial he was 21 years of age; he seems to have acquiesced in all that his father did in the matter. He was personally familiar with the work done by the Boswells, and knew that this work was done on property which had been staked out as part of the Grand Prize mine. He made no objection. He consented to the purchase by his father in his father's name, from the state land board, of property which included the bulk of the Grand Prize location. At the inception of this suit he executed an affidavit to the effect that he had not authorized anyone to use his name as a party plaintiff, and made a similar statement verbally in the presence of two witnesses who have testified in the cause. We think that he ought not to be permitted to claim the property in dispute as against the Boswells.

8. It is admitted that W. A. Akers furnished a part of the money which was paid by T. M. Anderson on account of the purchase price of the property purchased by him, and that Akers was part owner in the Grand Prize mine. Akers was made a party defendant to the cause on his own petition, and as a witness he strongly asserts the validity of Boswell's title.

9. The only remaining party whose rights are to be considered is Grand Prize Hydraulic Mines. Under the rule applied in *Clark* v. *Hindman,* 46 Or. 67 (79

Pac. 56), this party cannot claim any rights superior to those of T. M. Anderson, unless it was an innocent purchaser for value.

10. It appears that on September 5, 1913, T. M. Anderson gave a verbal option of some sort to Thomas Wilson of Manhattan, Nevada. It is provided by Section 5132, L. O. L., that a mining claim shall be deemed real property, and it follows as a corollary that an interest in a mining claim cannot be created by a verbal option. Under date of October 24, 1913, an agreement was entered into between T. M. Anderson, Martha Anderson, T. J. Anderson and W. A. Akers, as parties of the first part, and Thomas Wilson and A. C. Stock, as parties of the second part; this agreement was subsequently and on November 13, 1913, assigned to Grand Prize Hydraulic Mines. Whatever right the latter party has in the premises must grow out of this agreement. The agreement is in part as follows:

"This agreement, made this 24th day of October, 1913, between, T. M. Anderson and Martha Anderson, his wife, T. J. Anderson and W. A. Akers, both unmarried, all of Holland, Oregon, parties of the first part, and Thomas Wilson of Manhattan, Nevada, and A. C. Stock of Reno, Nevada, parties of the second part, witnesseth: The parties of the second part have elected to take a contract of sale of the property hereinafter described under their option of September 5, 1913, heretofore executed between the parties hereto, and to that end and in consideration of one dollar and other valuable consideration unto the first parties in hand paid by the second parties, the receipt whereof is hereby acknowledged, the first parties hereby covenant and agree to sell and convey unto the second parties on or before five years from November 1, 1913, for the purchase price of $100,000.00 all of the following described mining property, to wit: in moieties of two-thirds unto Thomas Wilson and one-third unto A. C. Stock. The Grand Prize mining claim, comprising 20 acres in gov-

ernment lot 4, 20 acres in government lot 3 and 10 acres in government lot 2, all being patented land in section 36, township 39 south, range 7 west of Willamette meridian.''

Then follows a description of a number of mining claims with which we are not concerned in this case. The agreement continues:

"Provided, however, that the second parties shall have the election of dividing said premises and taking a portion of the same only, viz.: The second parties may purchase within the period aforesaid all of the creek channel in lot 4 being that portion between the banks estimated at 10 acres, also, all of the Vale claims aforesaid; also all of the Grayback claims aforesaid; also an undivided one-half of all ditches, ditch rights and water rights from Cave and Lake creeks, for a purchase price of $1,100.00 [probably intended to be $10,000.00]; also all the other ditches and ditch rights and water rights above mentioned, payable in the same proportionate installments as is hereinafter set forth for the payment of the total purchase price; or the second parties may elect to take all of the remainder of the property first herein described for a purchase price of $90,000.00, payable in the same proportionate amounts and time as in case of the purchase of the whole property first herein described.''

The agreement then provides that the second parties should continue in possession and operation of the property, paying to the first parties 20 per cent of the net product of the mine during the year beginning November 1, 1913, and 25 per cent of such net product thereafter, providing however, that $50,000 should be paid within three years from November 1, 1913, and that the remaining $50,000 should be paid within 2 years thereafter. The agreement then provides:

"But should the second parties elect to segregate the property and take either portion thereof as aforesaid, at the price hereinbefore stated, then they shall during

the same period pay and render such sums as the purchase price for either of the properties so elected to be purchased bears to the whole purchase price.''

After a number of other provisions not material for present purposes, the contract contains the following clause:

''It is further agreed that the second parties may at any time elect to terminate this contract by surrendering the possession of said property, together with all payments heretofore made as hereinbefore provided for.''

11, 12. We think it cannot be maintained that the assignee of this contract was an innocent purchaser of the property therein described. · While the testimony shows that the corporation has expended $20,000 in the development of the Grand Prize mine, we think it clear that the effect of the contract is merely to vest Wilson and Stock and the corporation as their assignee with an option of purchase. These parties are clearly entitled under the contract to surrender possession at any time, and such surrender relieves them from all obligation to pay further moneys on account of the purchase. We may add that it is by no means clear that the description contained in the foregoing contract covers the property in dispute. It should also be said that Mr. A. C. Stock, one of the parties of the second part in this agreement, was the secretary of the Grand Prize Hydraulic Mines; that he was on the premises during the early part of 1914 and saw the Boswells at work on the property in dispute, and that he offered no objection to their mining the property which his corporation is now claiming. On March 10, 1914, Mr. Stock wired Mr. Wilson, the president of the Grand Prize Hydraulic Mines, as follows:

"Boswell has opened up very rich pocket 30 feet from our line, running into big dyke, quartz full of gold, taking out $100.00 per day, don't tie up any of my personal stuff, write you full particulars Manhattan."

On March 27th Mr. Wilson wired T. M. Anderson, as follows:

"Protect my verbal option through you with Dan, advise me fully, also see Boswell for me."

Anderson replied to this telegram, as follows:

"Received your telegram, two men looking over Dan Sutherlands. Seen Boswell and he will hold."

There is evidence in the record that T. M. Anderson made a second effort to buy the property in dispute from Boswell, although it does not clearly appear that his effort so to do was in compliance with the Wilson telegram. On the whole, we can see no reason for relieving Grand Prize Hydraulic Mines from the estoppel with which its vendor is chargeable.

13. It is true that the answer of the defendant does not plead an estoppel, but the facts as we have outlined them above are set forth in the answer, and we think we should give them their legal effect after trial and on appeal. This we understand to be the rule announced in *Carlyle* v. *Sloan,* 44 Or. 357, 369, 370 (75 Pac. 217). It follows that the decree of the lower court should be affirmed, and that the injunction restraining the defendants from operating the property in dispute during the pendency of this appeal should be dissolved.                           AFFIRMED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE MOORE and MR. JUSTICE BEAN concur.