Argued May 7, reversed, injunction issued June 19, 1957

# STATE HIGHWAY COMMISSION *v.* RAWSON
## ET AL
### 312 P. 2d 849

*Frederick A. Morgan,* Assistant Attorney General, argued the cause for appellant. With him on the brief were Robert Y. Thornton, Attorney General for Oregon, and C. W. Enfield, Leonard I. Lindas, and William H. Winslow, Assistant Attorneys General.

*Norman N. Griffith,* of Portland, argued the cause and filed a brief for respondents.

Before PERRY, Chief Justice, and BRAND, MCCALLISTER and KESTER, Justices.

BRAND, J.

This is a suit in equity brought by the State of Oregon by and through its Highway Commission against the defendants Fred P. and Sam D. Rawson, wherein plaintiff seeks an injunction restraining the defendants from trespassing upon and removing cinders from the lands described. The trial court dismissed the suit and plaintiff appeals. The complaint alleges that the plaintiff is the owner and in possession of "The southeast quarter (SE-¼) of the southwest quarter (SW-¼) of Section 13, Township 11 South, Range 12 East, W. M., Jefferson County, State of Oregon." It is further alleged that on 3 August 1953 plaintiff commenced an action at law for damages sustained by reason of the wrongful entry upon plaintiff's property by the defendants and the removal by said defendants of large quantities of cinders, and that on the 22nd day of January 1954 defendants wrongfully entered upon the property and removed large quantities of cinders. It is alleged that defendants threaten to continue to trespass and remove cinders, and the prayer is for an injunction. Defendants separately demurred to the complaint. The demurrers were properly overruled. The complaint stated facts which if proven would warrant injunctive relief. Each defendant then filed a "second amended answer and counterclaim" denying the material allegations of the complaint.

It is admitted that plaintiff commenced an action at law against the defendants on 3 August 1953 and that Sam Rawson was on the claim of Fred on 7 January 1954 and had a power shovel thereon and on 2 February 1954 was working a power shovel on the "above described land." By way of "counterclaim" de-

fendants allege that defendants Rawson were and are a group and an association of persons who on 12 February 1953 located the following placer mining claims, each containing 20 acres more or less, the east half of the land described in the complaint being located as a mining claim by Fred and the west half being located as such claim by Sam Rawson. Defendants allege that at all times subsequent to 12 February 1953 defendants have been and are the owners of and entitled to the possession of said placer mining claims. We quote from the answers:

"IV.

"On and prior to February 12, 1953, said land above described was unoccupied unclaimed and unappropriated mineral land of the State of Oregon and on said day, defendants Rawson, having discovered mineral deposits of volcanic cinders on said land, entered upon said land, and located it, and posted location notices at a conspicuous place on said land, to-wit, at the point of discovery, which was the quarter corner between said Section 13 and Section 24, Township 11 South, Range 12 East, of the Willamette Meridian, Jefferson County, Oregon. On April 10, 1953, defendants Rawson filed in the office of the County Clerk, Jefferson County, Oregon, a copy of each notice of location of each said claim to which was attached an affidavit by the respective locator that all necessary work had been done on his said claim, all in accordance with local customs, and the mining laws of the United States and the State of Oregon."

Defendants allege that they are in possession of said land and they set forth the development work done thereon. They allege that the lands contain volcanic cinders in commercial quantities and that they are valuable minerals having a market value. They further allege that:

## "VII.

"On or about April 10, 1953, defendant Fred P. Rawson, for himself and as agent for defendant, Sam. D. Rawson, made due written application to the State Land Board, giving a description of said claims, to lease said claims. Thereafter, State Land Board wrongly refused to execute any document evidencing such a lease upon the ground and for the reason that the Oregon State Highway Commission was in control of said land, and that negotiations for a lease should be with said Highway Commission.

## "VIII.

"At all times herein subsequent to April 10, 1953, defendants Rawson have been and are now lessees of the said land from the State of Oregon upon a royalty basis of ten per cent of the gross value of all minerals produced and said lease is without limitation as to time."

Defendants then state that they have produced not more than 400 cubic yards of cinders having a gross value of fifty cents per yard and that ten per cent of the said value is $20.

It is alleged that defendants have not tendered said royalties to the State Land Board because such tender would be useless, but they now tender the royalties. Defendants allege due performance of the "lease" and due diligence in the development and operation. They pray that plaintiff's complaint be dismissed and that the plaintiff State of Oregon and the Highway Commission be enjoined from action inconsistent with defendants' said lease.

The plaintiff filed replies, in effect, denying that defendants located any placer claims on the lands described or that defendants are owners thereof. Plaintiff further denies the allegations of Paragraph IV of

the counterclaim quoted supra. It admits that defendants did development work; admits that the land contains volcanic cinders having market value; admits that defendants made application to the State Land Board and that the land is subject to the control of the Highway Commission; admits that no tender was made to the Land Board. Plaintiff denies that defendants are lessees of the land and denies the other allegations of the answers.

At the opening of the trial it was agreed that the case was "very largely a question of law", the plaintiff contending that the statute on which defendants relied was not applicable to the land in question. The parties stipulated that at the time defendants filed their application for a lease the property was owned by the plaintiff. The citizenship of defendants is admitted. It is admitted that defendants "purportedly located" the placer mining claims on the lands described and complied with the formalities of the mining law, the question as to the legal effect of the purported location being in dispute. Plaintiff admitted the allegations of paragraph IV of the counterclaim (see supra) except that it denies that the lands were unoccupied, unclaimed or unappropriated. It is sitpulated that defendants made excavations and did development work and had a power shovel on the lands at various times and removed cinders and tendered into court the alleged royalties and performed the conditions of the purported lease. The following exhibits were received without objection: the notices of location of placer mining claims dated February 12, 1953; and the application to the State Land Board for a lease. Other exhibits received without objection were two letters from the clerk of the State Land Board denying the authority of the Board to execute the re-

quested lease. Other stipulations were that Round Butte on which the disputed tract is located is 600 feet above the surrounding country; that there were laid bare in excess of 50,000 cubic feet of cinders on the claim and that in 1951 F. L. Summers removed substantial quantities of cinders from the abutting 40 acres with the consent of the Highway Commission and that they were used on a county road pursuant to an agreement between the United States, the State of Oregon and Jefferson County.

In his opening statement counsel for the plaintiff said that "The whole case depends upon whether the statute authorizing a lease by the Land Board applies to the property in question." Counsel for defendant agreed. Counsel for plaintiff also made a qualified admission, as follows:

"* * * The question is, by Statute does that cover this land or does it not.

"THE COURT: That one is the Statute that provides the State Land Board may grant a lease?

"MR. WYCKOFF; That's right.

"THE COURT: And if it fails to grant a lease under certain claim or condition then the party seeking—

"MR. WYCKOFF: He is more or less granted a lease by operation of law and payment of royalty. * * *"

█ We do not consider that this court is bound by the "more or less" admission of counsel that because the parties did not agree on the royalties to be paid defendants had a lease by operation of law. Counsel cannot give up the rights of the state by an admission as to the legal effect of a statute.

We will first consider the contention of the defendants that they became lessees by operation of law.

We will then address ourselves to the basic question on which the parties have submitted the case, namely, whether the statute authorizing mining leases by the State Land Board applies to this land purchased by the State Highway Commission.

By their own allegations it is established that defendants made written applications to the State Land Board for a lease and the Board refused to execute any lease for the reason that the Highway Commission was in control of the land. How then do defendants support the allegations that they are now lessees? Their reliance is expressly placed upon Oregon Laws 1941, chapter 262 which remained in effect from its enactment until the passage of Laws of 1955, chapter 528. The 1941 law was therefore in effect and was controlling at the time of the alleged location of placer claims, the filing thereof, the application for lease, and the adverse action thereon by the Land Board and the alleged trespasses by the defendants and the filing of plaintiff's suit. The statute provides:

> "The manner of locating a mineral claim upon state land or upon land whereon the mineral rights have been reserved by the state shall be in accordance with the laws of the state of Oregon and of the United States regulating the location of mineral claims upon government lands. Whenever a person shall have perfected the location of a claim, evidence of such location shall be sufficient to establish a right to lease such claim; provided, that application for such lease, giving a description of such claim, shall be made to the state land board within a period of 60 days after the notice of location has been filed." Oregon Laws 1941, Ch. 262, Sec. 1.

We shall assume for the purposes of this case only that the manner of locating the defendants' alleged claims was in accordance with the laws of the State of Oregon and of the United States which regulate

locations on government lands. The "manner" of locating clearly refers to the *procedure* required, and the statute purports to adopt the procedure which is required for locations on government land to the procedure on state land. The 1941 act further provides:

"The state land board hereby is authorized to execute leases and contracts upon a royalty basis for the mining of gold, silver, copper, lead, cinnabar, gas and oil, or other valuable minerals from any land which is owned by the state or whereon the mineral rights are reserved by the state, upon such terms and conditions as may be agreed upon by said state land board and the lessee; provided, that in the event the said parties cannot agree upon the terms of a lease, other than a lease for the mining of gas or oil, as to the amount to be paid to the state land board, then, in such event, the same shall be upon a royalty basis of not to exceed 10 per cent of the gross value of all minerals produced. All leases shall be without limitation as to time; provided, that the state land board may exercise the authority to cancel any lease upon failure by the lessee to exercise due diligence in the prosecution of the prospecting, development or continued operation of the mine, and shall insert in every such lease appropriate provisions for such cancelation. For the purpose of making necessary investigations before the execution of any such lease, the state land board is authorized to charge a reasonable fee to be paid by the applicant." Oregon Laws 1941, Ch 262, Sec 2.

■ If the defendants acquired a lease on portions of the land claimed by the state as a state park, it must have arisen by operation of law and contrary to the expressed intent of the alleged lessor, to us, a most unusual type of lease. A lease ordinarily arises out of contract. It has been defined thus: " 'A lease is a contract for the possession and profit of land by the lessee, and a recompense of rent or increase to the lessor,

and is a grant of an estate in the land; * * *.'" *Stinson v. Hardy,* 27 Or 584, 41 P 116. Defendants of course rely upon Sections 1 and 2 of Oregon Laws 1941, Chapter 262, set forth supra, which became OCLA (S), § 106-321 and OCLA (S), § 106-322 respectively. For the purposes of this specific inquiry we shall assume that defendants had "perfected the location of a claim" on the described lands of the plaintiff, a contention later to be considered. Section 1 of Chapter 262 of Laws 1941 provides that "evidence of such location shall be sufficient to establish a right to lease such claim; * * *." Section 2 of the act authorizes the State Land Board "to *execute* leases * * * upon a royalty basis for the mining of * * * valuable minerals from any land which is owned by the state * * * upon such terms and conditions as may be agreed upon by the state land board and the lessee; * * *." (Emphasis ours.) Thus far it appears clearly that the legislature contemplated a written lease, one to be "executed" and to be the product of mutual agreement.

■ We observe that the State Land Board "shall make such rules and regulations as are necessary for the transaction of business and carrying out the provisions of the law applicable to such board." OCLA, § 106-103 as amended by Laws 1943, Chapter 175, Section 4. The lease is to contain such terms and conditions as may be agreed upon. The proviso relates to only one term of the lease, namely, the amount of royalty to be paid. As to that matter only, it is provided "in the event the said parties cannot agree upon the terms of a lease * * * as to the amount to be paid * * * then * * * the same shall be upon a royalty basis of not to exceed 10 per cent * * *." Laws of 1941, Chapter 262, Section 2, supra. We find no other limi-

tation of the normal power of the Land Board to impose in its sound discretion terms and conditions for the protection of the public interest. It fact it is expressly provided that the Land Board shall "insert in every such lease appropriate provisions for * * * cancelation * * * of any lease upon failure by the lessee to exercise due diligence in the prosecution of the prospecting, development or continued operation of the mine." Id. Again, the statute authorizes the Land Board to make necessary investigations. No investigation would be necessary or useful if the applicant acquires a lease by operation of law when the Land Board refuses to give him one. Finally, the investigation is to be made before the "execution" of any such lease, clearly implying that a written instrument is contemplated. Taken by its four corners we think the legislative intent is clear. When a person has perfected the location of a claim he has qualified himself as a lessee and has a "right to lease", but under such reasonable terms and conditions as the Land Board may impose in the public interest, subject only to the proviso concerning the amount or royalty and even upon that provision the amount of royalty shall be not to exceed 10 per cent. Conceivably, the Land Board might fix the royalty at less than that percentage.

■ A decision of this court under the law as it stood prior to the 1941 act tends to support the opinion which we have expressed. Claimants located a mining claim on school lands of the State of Oregon. The statute provided that such person shall have a preference right to lease the same. OCLA, § 106-323. This court said:

"* * * We think, therefore, that when appellants Anderson located the Grand Prize mining

claim they acquired only a temporary possessory right, subject to be divested by a failure to purchase or lease the property in accordance with *such reasonable regulations* as the state land board might prescribe." *Grand Prize Hydraulic Mines v. Boswell,* 83 Or 1, 7, 151 P 368, 162 P 1063.

We conclude that whether the defendants did or did not employ the required procedure for perfecting a mining claim, they did not thereby acquire a lease by operation of law. Whether they could have instituted appropriate proceedings to compel the Land Board to grant a lease under reasonable terms to be fixed in its sound discretion would present a different question. In that connection see *Robertson v. State Land Board,* 42 Or 183, 70 P 614, wherein it was held:

> "The State Land Board, which is authorized by law to sell the public school lands of the state, to invest the proceeds of such sales, to make rules for the transaction of business, and to decide all disputes between applicants as to priority of right, is a co-ordinate branch of the state government, and its decisions and the exercise of its discretion cannot be controlled by the courts." Headnote, 42 Or 183.

We come now to the question as to the alleged right of the defendants to file mining claims against this specific land. We will first consider the evidence tending to show that the two mining claims were filed against lands held by the Highway Commission for park purposes. From the preliminary conversation between counsel and the court we quote:

> "MR. WYCKOFF: It was—the land was on the delinquent tax rolls and was acquired from Jefferson County and along with other lands acquired from Jefferson County by purchase by the State as a part of this park.

"THE COURT: Let me understand this. Part of this land title came to Jefferson County by reason of tax delinquency.

"MR. WYCKOFF: That's right.

"THE COURT: And part came to Jefferson County by reason of purchase?

"MR. WYCKOFF: No. Although we won't produce any evidence, Jefferson County acquired it by foreclosure proceedings.

"THE COURT: Tax foreclosure?

"MR. WYCKOFF: Yes, sir.

"THE COURT: No question about that?

"MR. GRIFFITH: We have no information to the contrary.

"THE COURT: Purely a matter of record?

"MR. GRIFFITH: That's right."

From this we gather than the land had been in private ownership, was thereafter acquired by the county for delinqent taxes, and was then sold by the county to the plaintiff. The deed is in evidence and shows that in consideration of the sum of $1,666 the county did bargain, sell and convey the land in question, together with other land, to the State of Oregon by and through its Highway Commission. The statute authorized the county court to sell, exchange and lease "all lands heretofore or hereafter acquired by the counties of this state by foreclosure of delinquent tax liens  *  *  *." OCLA, § 86-141. The state paid for the land from the funds set apart for park purposes and for no other purpose.

Witness Koons, Assistant State Park Superintendent for the Highway Commission, testified concerning the portion of the Palisade State Park surround-

ing Round Butte and including the 40-acre tract. We quote:

"A Round Butte is at the northerly end connected with this State Park by access road. The Round Butte is a cinder butte, quite symmetrical in shape, some 600 feet high. The top of it provides a parking area and overlook for the entire area into the Deschutes and up into the Crooked and view point for many miles, all directions from the point.

"Q State what uses are made of Round Butte of a park nature?

"A Round Butte is an area that is the tallest and people come to view the scenery. Also it is being used by church groups that come to our services and other groups that hold services in that area."

There is no evidence of any improvements having been made upon the 40-acre tract, but the evidence discloses that since 1940 approximately $240,000 has been spent on the park, and in the past four years there has been expended on the Round Butte portion of the state park about $17,000. A road has been graded and oiled from the main body of the park to Round Butte and a parking place has been prepared thereon. The place is visited by tourists. The butte is for scenic outlook and from this point of elevation one can "see the canyon and the hills and the entire terrain there."

Plaintiff offered in evidence an Oregon State Highway Department map of the quarter-section in which the purported mining claims are located. It was received without objection. The defendants also offered as their exhibit 8 a colored map marked "State Highway Department * * * The Cove-Palisades Park". Upon interrogation by counsel for the defendants the witness Koons testified that the map truly and cor-

rectly delineates the boundaries of the Cove State Park and the sources from which the land was acquired. At request of the court the witness testified:

"A That outline in red is the park boundary and State owned property.  *  *  *

"THE COURT: Does Round Butte appear to be marked?
"A Yes, sir.

"Q (By Mr. Wyckoff) That correctly identifies Round Butte as to the ultimate sources from which it came, does it not?
"A Yes."

Examination of the map discloses that the area in controversy, together with other land surrounding Round Butte, is encircled by the red line of the map. The main tract of the park is also encircled by a red line. The main portion of the land enclosed by the red lines is marked "Park 360". The land in controversy is also marked "P 360-C Jefferson County". On recross examination by counsel for the defendants, the witness Koons testified:

"Q  *  *  *  How do you know a particular piece of land is in a State Park after the State has acquired it?
"A If it is a State Park the deed will show your State Park, would be marked State Park.

"Q What is the nature of the mark?
"A It would be P. before the number."

The defendants contend that the area in question is not a part of any state park because no resolution of the State Highway Commission was introduced to establish that fact. It may be that the state failed to produce the best evidence upon that issue, but in view of the evidence which we have reviewed supra, the

most significant part of which was introduced by the defendant, and all of which was received without objection, we conclude that the disputed area was within a state park and that the trial court erred in holding to the contrary.

In holding that the land in question was purchased for park purposes we do not mean to intimate that the plaintiff's case depends solely upon proof that the land was purchased by the Commission for that specific purpose. In addition to the broad powers vested in the Highway Commission to acquire land for highway use and uses incidental thereto, the statute authorized the Commission to acquire land not only for parks, but also for parking places, camp sites, recreational grounds and "other places of attraction and scenic value". OCLA, § 100-115, now ORS 366.345. It was also authorized to purchase land for gravel pits or for the appropriation of road building materials, such as volcanic cinders, and for many other public purposes, and we must presume that the land was purchased for some public purpose authorized by statute.

The principal question presented by the parties is one of statutory construction. Defendants rely upon the provision that the State Land Board is authorized to "execute leases * * * for the mining of * * * other valuable minerals from *any land which is owned by the state * * *.*" Oregon Laws 1941, Ch 262, Sec 2, supra. (Emphasis ours.) This provision they assert to be clear and unambiguous and to authorize the Land Board to rent to private persons lands acquired by the Highway Commission for public purposes under statutory authority. It may be conceded that if the judicial view is restricted to the bare words quoted, the provision would appear to be unambiguous, but the test of ambiguity is not thus limited.

In *Gouge v. David et al.,* 185 Or 437, 455, 202 P2d 489, this court said:

"* * * The courts hold that even if an act is expressed in clear language, a conclusion may be warranted that an ambiguity exists if literal interpretation will produce an absurd result or one at variance with the policy of the legislation as a whole: United States v. American Trucking Assn., 310 U.S. 534, 84 L. Ed. 1345, 60 S.Ct. 1059; Fox v. Galloway, 174 Or. 339, 148 P.2d 922."

From American Jurisprudence we quote with approval:

"* * * An ambiguity justifying the interpretation of a statute, is not simply that arising from the meaning of particular words, but includes such as may arise in respect to the general scope and meaning of a statute when all its provisions are examined. The courts regard an ambiguity to exist where the legislature has enacted two or more provisions or statutes which appear to be inconsistent. There is also authority for the rule that uncertainty as to the meaning of a statute may arise from the fact that giving a literal interpretation to the words would lead to such unreasonable, unjust, impracticable, or absurd consequences as to compel a conviction that they could not have been intended by the legislature. * * *" 50 Am Jur 209, Statutes, § 226. Citing cases.

As stated in the above quotation from American Jurisprudence, it is not always necessary that ambiguity shall appear in the particular phrase or clause under examination. We agree of course that the primary rule of construction is to ascertain the legislative intent. *Perry Transport Inc. v. Heltzel,* 202 Or 161, 272 P2d 965; *Holman Transfer Company v. Portland,* 196 Or 551, 249 P2d 175, 250 P2d 929; *Swift & Co. and Armour & Co. v. Peterson,* 192 Or 97, 233 P2d 216;

*Fox v. Galloway,* 174 Or 339, 148 P2d 922. We have said that in determining the legislative intent:

"\* \* \* The cardinal rule of statutory construction is to ascertain the meaning of the legislature and give it effect, if such meaning is constitutional. In determining the intent many things are taken into consideration: the language used, the object to be accomplished, whether a literal interpretation of the language will lead to an impossibility or an absurdity, the history behind the act, and numerous other matters, no one of which is absolutely controlling as to the legislative intent. It is from a combination of all these that the intent is deduced: \* \* \*

\* \* \* \* \*

"When, however, a literal application of the language produces an absurd or unreasonable result, it is the duty of the court to construe the act, if possible, so that it is a reasonable and workable law and not inconsistent with the general policy of the legislature: \* \* \*." *Fox v. Galloway,* supra, 174 Or 346, 347. See also *Peters et al v. McKay et al.,* 195 Or 412, 238 P2d 225, 246 P2d 535.

In *Allen v. Multnomah County,* 179 Or 548, 554, 555, 173 P2d 475, we said:

"When the legislative intent has been ascertained, it should be given effect, even although, in doing so, the literal meaning of the words used is not followed. Wood v. State, 133 Tex. 110, 126 S.W. (2d) 4, 121 A.L.R. 931, 935. In arriving at the legislative intention, it is proper for the court to take into consideration the policy and purposes of the act, and to consider, in that connection, whether or not such policy and purposes will be attained by a literal interpretation of the language used. \* \* \* The general language of the statute should be limited to the persons and subjects to which it is reasonable to suppose it was intended

to apply, especially when a literal interpretation would lead to harmful and absurd consequences. * * *"

To the same effect see *Swift & Co. and Armour & Co. v. Peterson, supra.*

As said by Mr. Justice Lusk, dissenting in *Berry Transport, Inc. v. Heltzel,* 202 Or 161 at 184, 272 P2d 965:

"* * * A court which treats a particular provision of a statute as though it were a waif without known parents, relatives or associates, is likely to miss the meaning of the particular provision. This court has recently emphasized the necessity of considering a statute as a whole in order to ascertain the meaning of a part. Lommasson v. School District, No. 1, 201 Or 71, 261 P2d 860, 267 P2d 1105. As someone has said: 'A text without a context is a pretext.' * * *." See also Peters et al v. McKay et al, supra, 195 Or 412, 238 P2d 225, 246 P2d 585.

■ We must also take note of the rule established by our decisions which gives persuasive though not conclusive effect to the practical administrative construction of statutes. The rules of construction to which we have referred are peculiarly applicable to this case. On the one hand we have a statute authorizing the Land Board to execute leases for mining "from any land which is owned by the State of Oregon." We know that the statute applies and has been applied to school lands granted to this state by the federal government pursuant to the act of Congress admitting Oregon into the Union. 5 ORS, page 1079. We also know that the proceeds from the sale of school lands and the proceeds of all property granted to the state, when the purposes of such grant shall not be stated, shall be set apart as a separate and irreducible fund to be called

the "Common School Fund", to be exclusively applied to the support and maintenance of common schools. Constitution of Oregon, Article VIII, Section 2. By the Laws of 1919, Chapter 145, Section 16, it was provided that:

> "All moneys received from the rental, sale, disposition or use of lands belonging to the state of Oregon and all moneys receivable by the state of Oregon under the various contracts and agreements made in pursuance to the provisions of this act shall be paid into the state treasury and become a part of the irreducible school fund." OCLA, § 106.216, now ORS 273.760.

Thus we have an area to which the mining lease statute clearly applies and the statutes clearly allocate the proceeds of sale or rental to a specific fund for school purposes.

On the other hand we have the statutes authorizing counties to convey to the State of Oregon any real property "owned by the county including that acquired pursuant to tax foreclosure proceedings * * *." OCLA, § 86-111, now ORS 275.070.

The highway fund and the sources from which it is derived are defined by statute. After enumerating the sources of the fund the statute provides, "The highway fund shall be deemed and held as a trust fund and may be used only for the purposes of this act." OCLA, § 100-108, now ORS 366.505. The policy of this state to keep highway funds separate and to devote them exclusively to the purposes authorized by law was fortified by the adoption in 1942 of a constitutional amendment which provides that the proceeds from gasoline and motor vehicle taxes shall:

> "* * * after providing for the cost of administration and any refunds or credits authorized

by law, be used exclusively for the construction, reconstruction, improvement, repair, maintenance, operation, use and policing of public highways, roads and streets within the state of Oregon, including the retirement of bonds for the payment of which such revenues have been pledged, and also may be used for the acquisition, development, maintenance, care and use of parks, recreational, scenic or other historic places and for the publicizing of any of the foregoing uses and things." Constitution of Oregon, Article XI, Section 3.

At least since 1939 the Highway Commission has been authorized to acquire by purchase with such trust funds land necessary for the development and maintenance of parks, recreational grounds, scenic places and the like. OCLA, § 100-115(6)(7), now ORS 366.345. Also since 1939 the Highway Commission has been vested with complete jurisdiction and authority over all state parks, recreational grounds or places acquired by the state for recreational purposes. OCLA, § 100-114, now ORS 366.205. If the Highway Commission purchased the land in question with trust funds for purposes authorized by statute, we must presume that it holds the lands so purchased for such purposes.

The statutes have not only provided that the highway fund is a trust fund; not only that such funds may be used to purchase property for authorized purposes, but they have also shown a progressive policy concerning the disposition of such property. By the Laws of 1927, Chapter 69, Section 2, Oregon Code 1930, Section 44-118, the Highway Commission was authorized to sell or otherwise dispose of lands heretofore or hereafter acquired by the State Highway Commission, title to which lands or property has been taken either in the name of the State Highway Commission

or in the name of the State of Oregon, if in the judgment of the Commission the lands are no longer needed or useful for highway or other purposes. This provision was repealed by the Laws of 1939, Chapter 529, Section 29. The comprehensive highway code which was enacted by said Chapter 529 in substance reenacted the provisions of the 1927 Laws, Chapter 69, Section 2, Oregon Code 44-118, the only change being that the Commission was authorized to sell, *exchange* or otherwise dispose of such lands. OCLA, § 100-115(10). (Emphasis ours.) This act was amended in 1953 to authorize sale *or lease* of such lands, and it provided that leases may be made when in the opinion of the Commission such real property will not be needed, required or useful for highway purposes during the leasing period. The act of 1927 provided that all funds derived from the sale of such land shall be credited to the State Highway Fund. The same provision was contained in the 1939 act, and in the 1953 act it was provided that "All funds or money derived from the sale *or lease* of any such property shall be by the State Highway Commission paid to the State Treasurer and by him credited to the State Highway Fund." Laws 1953, Ch 252(10), ORS 366.395(2). (Emphasis ours.) And see, ORS 366.505.

To summarize: From 1907 to date, we have had a system whereby the State Land Board was authorized to execute leases for mining from "any lands" owned by the state and whereby the proceeds from the sale or lease of lands within the purview of the act were allocated to the School Fund. Alongside the Land Board, but ten years later, the Highway Commission was created and its powers and functions were defined. Its funds also came from sources specified by statute. They were expressly declared to be trust funds and

were dedicated to the purposes specified in the act. The Highway Commission too was authorized to sell or lease lands under certain conditions and it was given general control over all matters pertaining to state highways and complete jurisdiction and authority over all state parks and lands acquired for recreational purposes.

Pursuant to statute the Commission purchased the property in issue here for purposes specified in the statutes, and if the Commission should now lease that property the funds received would be credited to the State Highway Fund.

It is apparent that the same land cannot be at the same time subject to the complete or exclusive control of two separate state agencies, nor can the funds expended and proceeds received come from or be placed in two mutually exclusive funds. Under the authorities cited it is our clear duty if possible to harmonize the seemingly inconsistent provisions of statute so as to give effect to both, in accordance with the apparent legislative intention.

At a later point we will consider the effect of Chapter 528, Laws of 1955, which was enacted while this case was pending in the circuit court. We shall now consider the construction of Chapter 262, Laws of 1941 in the light of the entire system of laws in effect prior to 1955 and relevant to the question at issue. That chapter became OCLA (S), §§ 106-321, 322, 323 and remained in effect until it was combined with Laws of 1945, Chapter 154, Section 5, OCLA (S), § 107-301(e) which related to the powers of the State Board of Forestry. The consolidation was accomplished by said Chapter 528 of the Laws of 1955, now ORS 517.420.

Upon a broad nontechnical view of the case it would

appear to be most unlikely that the legislature intended that all lands owned by the state should be subject to mining leases executed by the Land Board when the legislature has expressly authorized numerous other state agencies to sell or lease state-owned land for specifically authorized purposes. Among others, the State Board of Aeronautics is authorized to purchase land for the construction of airports. ORS 492.050(2). The Board may lease or otherwise dispose of portions of such land "upon such terms as the board may deem in the best interest of the state." Laws 1947, Chapter 543, Section 4, now ORS 492.060. Under such a statute it is difficult to conceive of a construction which would authorize the Land Board to decide what portion of lands acquired for air fields should be leased to private persons for mining purposes. Similarly the State Board of Education may acquire, hold, sell or lease certain lands under its control. Laws 1945, Ch 449, Sec 1, now ORS 351.060(3). Similar powers are vested in the Liquor Control Commission. Laws 1937, Chapter 448, Section 4, now ORS 471.725(2)(3). The State Board of Forestry was authorized in 1939 to lease forest lands, the proceeds therefrom to be credited to specified funds. Laws 1939, Chapter 478, Section 6, (OCLA, § 107-306). In 1941 that board was authorized to make contracts for the removal of minerals from forest lands "in no case exceeding 10 years" in duration. Laws 1941, Chapter 236, Section 5. In 1945 the Board of Forestry was authorized to execute leases of forest land for mining. Laws 1945, Chapter 154, Section 5(b). The 1945 act was amended in 1953 and the State Board of Forestry was again authorized to execute leases for the mining of valuable minerals "upon such terms and conditions as may be agreed upon by said board and the lessee;  *   *   *." Laws

1953, Chapter 65, Section 2(b). Other provisions were similar to those to be found in Laws of 1941, Chapter 262, concerning leases by the State Land Board. It is difficult to believe that the legislature intended that two different boards should have the power to lease the same land for the same mining purposes, each board to have the same right to determine and agree upon the terms and conditions of the lease. Referring to the 1941 act concerning the powers of the Forestry Board, it is almost inconceivable that that board should have had the right to lease land for mining purposes for terms not exceeding 10 years, while the Land Board was authorized to lease the same land "without limitation as to time   *   *   *." Laws 1953, Chapter 65, Section 2(b). The acts during this period can be harmonized only by holding that the Land Board had jurisdiction over one class of state lands and the Forestry Board had jurisdiction of other and different lands.

In 1951 the Department of Finance and Administration was authorized, with approval of the Governor, to lease "any state property, real or personal, not needed for public use   *   *   *   where the authority to lease *   *   *   is not vested in any other state agency." Laws 1951, Chapter 439, Section 49. This act would seem to imply that there did exist land owned by the state as to which no other state agency had authority to lease, and thus to limit the scope of the words "any land which is owned by the state" as used in the Laws of 1941, Chapter 262. Instances of the vesting in other states agencies of the power to sell or lease may readily be found.

■ Returning to the powers vested in the Highway Commission, we find it peculiarly significant that the Highway Fund is declared to be a trust fund. No doubt

all public funds are in a sense held in trust for public purposes and cannot be diverted to private or unlawful uses, but this particular provision must be given some meaning beyond that implied by law as to all public funds. It means that the highway funds are devoted exclusively to the particular public uses over which the Commission is given jurisdiction. By designating them as trust funds the legislature indicated an intention that property purchased with such funds should likewise be held for the specific purposes over which the Highway Commission had control and that the proceeds from the rental of such lands should likewise be so held. The development of the Highway Commission, its functions and funds, has been subsequent in time to the original system concerning the public lands and the Land Board. The Highway Commission has in the past construed the Laws of 1941, Chapter 262 as applying only to lands under the jurisdiction of the Land Board. From an opinion of the Attorney General, we quote:

> "Although the language of chapter 262, Oregon Laws 1941, is broad and comprehensive as it pertains to location of mining claims on land owned by the state or land upon which mineral rights have been reserved, the operating scope of the law has received a restrictive interpretation. Since the enactment of this act the practical and contemporaneous interpretation, by the administrative bodies of the state of Oregon, has been to limit its operating force to those lands falling within the jurisdiction of the state land board.
>
> "A contemporaneous interpretation of a statute is one made at or soon after the time of its enactment and where such contemporaneous and practical interpretation has continued for a considerable length of time considerable weight is to be given to that interpretation. See Sutherland, Statutory Construction, vol. 2, 3rd ed., pp. 520, 522.

" 'The practice and interpretation of administrative agencies may be considered in determining the powers granted to such bodies.' Sutherland, Statutory Construction, 3rd Ed., Vol 2, p. 516, n. 4.

"This interpretation is given additional impetus by the action of the legislative assembly in enacting chapter 236, Oregon Laws 1941, authorizing the state board of forestry to execute contracts for mining and removal of minerals from forest lands. The power of the board of forestry was further amplified by the 43rd session of the legislative assembly wherein § 5, chapter 154, Oregon Laws 1945, was enacted, containing almost identical provisions to that of chapter 236, Oregon Laws 1941." 26 Opinions of the Attorney General, page 149.

In the same opinion the Attorney General expressed the opinion that the "highway commission would have no authority to execute a mining lease pursuant to the express wording of chapter 262, Oregon Laws 1941, and that the operating force of chapter 262, was limited to those lands under the control and supervision of the state land board." We agree with this statement and it is clear that Chapter 262 of the 1941 Laws did not purport to vest in the Highway Commission the power to execute mining leases. However, the Attorney General's opinion was dated July 16, 1953. The 1953 legislature, prior to July, had passed the act to which we have referred supra, authorizing the Highway Commission to lease property not presently needed for highway purposes. Laws 1953, Chapter 252 (9) (10) page 379. The act went into effect five days after the Attorney General's opinion was written.

The cited statutory provision specifically authorizing the State Board of Forestry to execute mining leases on forest land appears almost conclusively to indicate that the words "any land which is owned by

the state" as used in Chapter 262, Laws of 1941, concerning powers of the Land Board, was not intended to include "all lands" or any lands under the exclusive control of a different state agency.

If we were to assume, contrary to the weight of evidence, that the lands in issue here were not purchased for parks or scenic uses, there would still be most persuasive reasons for denying the asserted right of the defendants to establish a mining claim on the property. The evidence indicates that volcanic cinders are of value in road building. The defendants, in an effort to show that the lands were not held for park purposes, dwelt at length upon the fact the Highway Commission had authorized other parties to take cinders from the butte and from a location adjacent to that claimed by the defendants. The cinders so taken were used for road purposes. Are we to hold that allegedly valuable mineral deposits of cinders purchased and owned by the state through its Highway Commission may be leased to private persons for their own profit and that even the royalties received must be turned over to the School Fund to the loss of the Highway Fund? We think not.

Defendants urge that any person familiar with mining law would understand the meaning of the allegation in defendants' answers that the "land above described was 'unoccupied, unclaimed and unappropriated' " mineral land of the State of Oregon.

Defendants cite *Girard v. Carson*, 22 Colo 345, 44 P 508, and *Sharkey v. Candiani*, 48 Or 112, 85 P 112, in support of the proposition that in the context of the mining law "unappropriated territory" means lands belonging to the United States which have not yet been appropriated by any private person. Assuming without deciding that the meaning of "unclaimed and

unappropriated" is the same when applied to state as well as to federal lands, we think that it cannot be said that lands once in private ownership which had been taken by the county for delinquent taxes and sold to the state through the Highway Commission for public purposes within the exclusive jurisdiction of that commission, and in connection with which, roads have been built, parking places prepared and cinders removed by public authority, and which lands, including those claimed by the defendants, have been used as a scenic point, are "unoccupied, unclaimed and unappropriated".

■ It is unnecessary for us to say that the authority of the State Land Board to execute mining leases is restricted to public lands under the jurisdiction of that board, although there are strong reasons supporting that proposition. We do say that the authority of the Land Board does not extend to the execution of mining leases on lands held by the Highway Commission. Our conclusion is strongly supported by *McNeil v. Kingsbury*, 190 Cal 406, 213 P 50 (1923). In that case, as in this, the words "lands belonging to the state" were so limited by construction as to exclude lands purchased and owned by the state for a state hospital. We quote from that decision:

"The whole question involved is one of the intent of the Legislature in the passage of the Oil Leasing Act. No question is raised by either side as to the right of the state to sell or lease the land used by the Norwalk State Hospital, but the question is whether or not such provision has been made by the Legislature in the act in question. In short, the question is whether the Legislature, in the general terms used in the statute concerning state lands, intended such provisions to apply to land used and controlled by public corporations utilizing lands belonging to the state for the purpose of

maintaining thereon hospitals for the care and treatment of the insane. That the terms of the statute are broad enough to cover such lands if literally construed is admitted, and hence the necessity of recourse to the well-established rules of construction stated by the Attorney General as follows:

" 'The law does not favor a repeal by implication, and where two statutes treat the same subject, one being special and the other general, unless they are irreconcilably inconsistent, the latter, though later in date, will not be held to have repealed the former, but the special act will prevail in its application to the subject-matter, so far as coming within its particular provisions'—citing Bateman v. Colgan, 111 Cal. 580, 44 Pac. 238; People v. Pacific Imp. Co., 130 Cal. 442, 62 Pac. 739; Trinity County v. Mendocino Co., 151 Cal. 279, 90 Pac. 685; Reed Orchard Co. v. Superior Court, 19 Cal. App. 648, 128 Pac. 9, 18; Estate of Brewer, 156 Cal. 89, 103 Pac. 486.

"This principle applied to public lands results in the rule that where lands are devoted to some special public use by legislative authority they are not included within general statutes concerning the disposal of public lands.  *   *   *"

We take note of other authorities which tend to support our conclusion. In *Newhall v. Sanger,* 92 US 761, 763, the United States Supreme Court construed the words "public lands" as describing "such as are subject to sale or other disposal under general laws." This statement was quoted with approval in *Morrow v. Warner Valley Stock Co.,* 56 Or 312, 340, 101 P 171.

In *United States v. Mobley,* 46 F'Supp 676, lands which were within the boundaries of a national forest had been set aside for a particular purpose authorized by federal statute under a special use permit. It was held that they were therefore not subject to subsequent location under the mining laws of the United States.

In *Superior Sand and Gravel Mining Co. v. Territory of Alaska,* 224 F2d 623, 9th Cir, the court said:

"Our task is to construe the 1939 statute, supra, and to determine the congressional intent in light of the practical situation which this case presents. Doubtless many of the school sections in Alaska are not under lease either wholly or in part, and as to such lands it is to be assumed that consent of the Territory to entry and the staking of mineral discoveries was not intended to be a condition precedent. But here the Territory was in possession and was in process of administering the reserved land in the manner and for the purposes authorized by Congress. Unlike lode claims, which may be worked without serious interference with surface uses, these placer locations and their exploitation would be utterly incompatible with the uses to which the school land was currently being put. Unregulated mineral entry upon the premises in such circumstances would inevitably give rise to chaos and controversy, and it is inadmissible to ascribe to the Congress a purpose productive of such results."

The case of *Oregon Railway Company v. City of Portland,* 9 Or 231, is of peculiar interest. We quote only from the syllabi:

"Under the provisions of the statute, without an agreement with the local authorities, a corporation cannot appropriate a highway or public grounds, already dedicated to a public use, to its exclusive use and occupation.

"In such case the grant of power to take property appropriated to public uses, cannot be exercised in such a manner as would obstruct or subvert such public uses."

See *State of Oregon v. Hyde,* 88 Or 1, 169 P 757, 171 P 582, where it is said:

"* * * The functions of the State Land Board, speaking broadly, are twofold. They are

charged with the sale of the state lands and also with the care and investment of the school funds arising from such sales. * * *." 88 Or at 47.

It appears to have been generally accepted that the above statement adequately described the general scope of the powers of that board. And see, *Grand Prize Hydraulic Mines v. Boswell,* supra, 83 Or 1, 151 P 368, 162 P 1063.

It remains only for us to consider the contention that the Laws of 1955 compel us to reject the construction at which we have arrived. In 1955 the statutes relative to the powers and jurisdiction of the State Highway Commission remained unamended so far as the issues in this case are concerned. Laws 1955, Chapter 528, is now ORS 517.420. The history of that statute is as follows: It had its origin in Laws of 1941, Chapter 262, supra, which became OCLA (S) §§ 106-321 and 322, and which authorized the Land Board to execute leases for mining. This law was combined by the code revisers with portions of Chapter 154 of the Laws of 1945, OCLA (S) § 107-301(e) which authorized the State Board of Forestry to execute leases for mining on forest lands under conditions substantially similar to those which applied to the Land Board. The result of the consolidation was ORS 517.420 which was as follows:

"(1) The manner of locating a mineral claim upon state land or upon land whereon the mineral rights have been reserved by the state, or upon state lands acquired pursuant to ORS 530.010 to 530.040, shall be in accordance with the laws of this state and the United States regulating the location of mineral claims upon government lands.

"(2) Whenever a person perfects the location of a claim, evidence of the location shall be sufficient to establish a right to lease the claim; provided,

that application for such lease, giving a description of the claim shall be made to the State Land Board, or to the State Board of Forestry, as the case may be, within 60 days after the notice of location has been filed."

Chapter 528 of the Laws of 1955 amended ORS 517.420 by adding:

"* * * and provided further, that no such lease shall be made without notice to the state agency holding title to or having jurisdiction and control over the land affected thereby, and giving said agency an opportunity to be heard."

It is this addition on which the defendants rely. We must first observe that under the pleadings defendants cannot claim any rights under Chapter 528 of the Laws of 1955. They are claiming to own a lease by operation of law because the Land Board refused to give them one. There is no allegation that notice was given to the State Highway Commission or that it was given an opportunity to be heard. If the 1955 act applies, defendants are out of court.

What defendants appear to claim is that legislative history of the 1955 act compels us to construe the 1941 act as giving to the Land Board the power and duty to execute mining leases on land acquired, owned and used by the Highway Commission, in other words, to give an unlimited meaning to the words "any land which is owned by the state * * *." Defendants rely greatly upon the fact that the Highway Commission was instrumental in an effort to secure the enactment of a clarifying statute in 1955. The bill, if enacted, would have removed the ambiguity to which we have referred. It was, however, amended and passed as Chapter 528 of the Laws of 1955 (ORS 517.420) and the ambiguity still, in our opinion, remains to be resolved. That act, ORS 517.410 and 517.420, as pres-

ently in force, authorizes the State Land Board to execute mining leases as to "any land owned by the state" and then in the same sentence authorizes the State Board of Forestry to execute mining leases as to forest land which is also owned by the state. Obviously it was not intended to give the same right to both boards to do the same act as to the same land. The statute will avoid absurdity if the words "any land owned by the state" are construed according to its, the statute's, original meaning as public lands under the jurisdiction of the Land Board. No change has been made in the statutes to which we have repeatedly referred which declare the Highway Commission to be the administrator of trust funds and which require that receipts from rentals by that commission be covered into the State Highway Fund. No change has been made in statutes vesting in the commission complete jurisdiction and authority over all state parks and similar places or in the many and broad statutes vesting jurisdiction over highways in the commission. It is unnecessary for us to determine whether or not some land held by some one of the many state agencies can be leased by the State Land Board after notice given to the agency holding title and after that agency has been granted a hearing. There are agencies established by law which have acquired title to state lands but which have not been granted authority to make leases. The State Highway Commission is not such an agency. In view of the powers given to that body and the duties imposed upon it, if we are to arrive at an orderly and harmonious construction of the law we must hold that lands held in trust by the commission are not included within the general phrase "land which is owned by the state". If notice had been given to the Highway Commission

and a hearing afforded to it under the purported authority of the 1955 amendment, the commission would have been authorized at such hearing to assert its exclusive jurisdiction and control over the land in question and deny any claim by the Land Board of the right to deprive it of such land.

The conflicts and confusion which would arise from the construction urged upon us by the defendants are so serious as to require that such construction be rejected. To adopt their theory would in effect enable the Land Board in its sole discretion to directly interfere with and obstruct the Highway Commission in its administration of highway funds, highway lands, state parks and scenic places which are among the richest assets of the State of Oregon.

The decree of the circuit court is reversed and an injunction will issue in accordance with the prayer of the complaint.